**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs-Appellants,**

**v.**

**CORPS OF ENGINEERS OF the UNITED STATES ARMY et al., Defendants-Appellees.**

**No. 72–1326.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1972.

Decided Nov. 28, 1972.

[redacted]

[redacted]

Richard S. Arnold, Texarkana, Ark., for plaintiffs-appellants.

Glen R. Goodsell, Atty., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before MATTHES, Chief Judge, LAY and HEANEY, Circuit Judges.

MATTHES, Chief Judge.

This is another of the rapidly increasing number of cases which are focused in large part upon, and result from the adoption of, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, which was passed by the Congress of the United States in December, 1969, and became effective January 1, 1970.

This litigation was triggered by the construction of a project known as Gillham Dam on the Cossatot River in Arkansas. The case is here on appeal by plaintiffs from the final order of the United States District Court, Eastern District of Arkansas, dissolving an injunction entered by that court on February 19, 1971, and dismissing the case.

## I. HISTORY OF THE PROJECT

Judge Eisele has recorded a clear and graphic description of the Cossatot River and its environs, and we are not inclined to attempt to improve on what has been written. *See* 325 F.Supp. at 744–745. We are content to pinpoint the subject by making a few observa-

tions which lie at the heart of the controversy over the Gillham project.

During normal water stage the Cossatot, like many mountainous streams, is a valuable asset to man. The splendor of the scenery is magnificent. The clean water attracts many species of game fish, and wildlife abounds in the area. Fishermen, hunters and outdoor enthusiasts frequent the region; the rapids and pools challenge canoeists. But there is another side to the coin. When heavy rains descend in the Ouichita Mountain Range, as they have from time immemorial, the normal flow of water in the Cossatot becomes a raging torrent and the floods become an enemy to man. Thus, competing forces have aligned themselves for and against the dam. In part, the proponents are interested in controlling the floods, creating the recreational facilities and commercial development which accompany man-made lakes, and supplying pure water to the City of DeQueen, Arkansas. The opponents advance, among other arguments, the value of conserving one of the few remaining free-flowing rivers in southwest Arkansas, the sports of stream fishing and hunting, and the diversity of canoeing experiences.

Gillham Dam is a part of a massive flood control plan authorized by Congress in the Flood Control Act of 1958.[1] The subject dam is one of seven authorized to be constructed in the Little River Basin. Of these, three have been completed, and three, including Gillham, are under construction. The Gillham project is designed to provide flood control, water supply and water quality control. Funds for construction were initially made available by the Public Works Appropriation Act of 1963.[2] Work began in 1963, and Congress has since regularly funded the project in-

cluding appropriations of 1.5 million dollars for fiscal year 1973.[3] As of September 1, 1970, the project was approximately two-thirds complete at a cost of 9.8 million dollars. Total project cost is estimated at 15.3 million dollars. While the spillway and outlet works have been substantially constructed, the dam itself remains to be built. At full flood control pool, which will occur on the average of once in twenty-five years, the reservoir created by the dam would inundate 13.5 miles of the Cossatot River and 4,680 acres of surrounding countryside. At top of conservation pool, sometimes referred to as "normal pool," the reservoir would inundate 7.7 miles of river and 1,370 acres of land.

## II.  HISTORY OF THE LITIGATION

The complaint was filed in the United States District Court on October 1, 1970. The plaintiffs are the Environmental Defense Fund, Inc. (EDF), Ozark Society, Arkansas Audubon Society, Inc., Arkansas Ecology Center, Platt Remmell, Jr., and Russell Harper. EDF is a nonprofit membership corporation organized under the laws of the state of New York. Ozark Society, Arkansas Audubon Society, Inc., and Arkansas Ecology Center are nonprofit membership organizations established under the laws of the state of Arkansas. The two individual plaintiffs are citizens of Arkansas. Initially, the named defendants were the Corps of Engineers of the United States Army,[4] Stanley Resor, Secretary of the Army, and General Frederick B. Clark, Chief of Engineers, Corps of Engineers of the United States Army. The action was filed in Judge Eisele's court, and he remained in control of the litigation continuously.

The district court dealt with the case in a series of six memorandum opinions

1.  Act of July 3, 1958, Pub.L. No. 85–500, § 201, 72 Stat. 305, 309.

2.  Act of October 24, 1962, Pub.L. No. 87–880, 76 Stat. 1216.

3.  Public Works for Water and Power Development and Atomic Energy Commis-

sion Appropriation Act of 1973, Pub.L. No. 92–405, 86 Stat. 621.

4.  The complaint was dismissed as to the "Corps of Engineers of the United States Army." Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 763 (E.D.Ark.1971).

filed over a period of one and one-half years. The first opinion held venue was proper. 325 F.Supp. 728 (Nov. 16, 1970). The second considered jurisdiction over the defendants and the subject matter, standing, and failure of the complaint to state a claim upon which relief could be granted. 325 F.Supp. 732 (Dec. 22, 1970). The third denied a preliminary injunction since plaintiffs had failed to demonstrate danger of imminent harm. 325 F.Supp. 737 (Dec. 22, 1970). In its fourth memorandum opinion, the court found that NEPA was intended to be applied not only to contemplated agency action, but also to ongoing projects.[5] 325 F.Supp. 741 (Jan. 21, 1971). The case was tried to the court on the merits on February 8, 9 and 10, 1971. In the fifth memorandum opinion, 325 F.Supp. 749 (Feb. 19, 1971), the court found that of the eleven claims for relief set forth in the complaint, only the two premised upon NEPA, claims one and eleven, were sufficient to grant relief. Accordingly, claims two through ten were dismissed.[6] The court went on to find that defendants had not complied with the provisions of NEPA which require a detailed statement of the environmental impact of the project and a development of appropriate alternatives to the proposed course of action. Therefore, the court enjoined defendants from proceeding further with the Gillham Dam project unless and until they fully complied with the Act. Both parties appealed to this court, but the appeals were dismissed by agreement on July 22, 1971.

On January 13, 1972, defendants filed with the district court the new environmental impact statement (EIS) and simultaneously filed a motion for summary judgment in which they requested the court to dissolve and set aside the injunction theretofore granted. After an evidentiary hearing on April 27 and 28, 1972, the court approved the new impact statement, granted summary judgment for defendants and dissolved the injunction. The court's supporting opinion, the sixth one filed, is reported at 342 F. Supp. 1211 (May 5, 1972). It is from this final order that plaintiffs bring the present appeal.

Appellants contend that, contrary to the conclusion of the district court, appellees have not sufficiently complied with NEPA for the following reasons: (1) the objectivity of the final EIS was tainted by the alleged bias of its draftor; (2) the final EIS makes a less-than-full disclosure and contains important errors of fact; (3) the defendants have failed to study, develop and describe appropriate alternatives; and (4) the administrative determination by defendants that the dam should be constructed was reviewable by the court on the merits.

## III. NATIONAL ENVIRONMENT POLICY ACT OF 1969

■■ In enacting NEPA,[7] Congress "resolved that it will not allow federal

5. Other courts have held that NEPA is applicable to projects under construction. *See* Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal.1972); Morningside-Lenox Park Assn. v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971); Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971). *See also* Guidelines for Federal Agencies under the National Environmental Policy Act, 36 Fed.Reg. 7724, 7727 (1971).

6. Aside from the two claims arising under NEPA, plaintiffs sought relief in the district court under the fifth, ninth and fourteenth amendments; the Civil Rights Act of 1871, 42 U.S.C. § 1983; § 2(b)

of the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. § 662(b); § 301 (b) of the Water Supply Act of 1958 as amended by § 10 of the Water Pollution Control Act Amendments of 1961, 43 U.S.C. § 390b(b); and the Clean Water Restoration Act of 1966, 33 U.S.C. § 466a (b)(1). Plaintiffs also argued that the benefits of the project were less than the estimated costs, in violation of 33 U.S.C. § 701a, and that defendants were proceeding without due regard for wildlife conservation, in violation of 33 U.S.C. § 540, and in excess of legislative authorization.

7. The Act is printed in pertinent part as an appendix to this opinion.

agencies nor federal funds to be used in a predatory manner so far as the environment is concerned." Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept., 400 U.S. 968, 978, 91 S.Ct. 368, 373, 27 L.Ed.2d 388 (1970) (Douglas, J., dissenting from denial of certiorari). Thus the Act requires all administrative agencies of the federal government in the process of project development and decisionmaking to consider the environmental impact of their actions. 115 Cong.Rec. (Part 30) 40416 (1969).

Section 101 of NEPA requires the federal government to use "all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" in order to achieve a wide range of environmental goals. Section 102, on the other hand, contains a series of specific procedural directives to the federal agencies, designed to implement the national environmental policy already established by § 101.[8] Among these procedures, § 102(2)(C) requires the preparation of a "detailed statement" discussing five subject areas, including the environmental impact of, and alternatives to, the project. Section 102(2)(D) directs the agency to "study, develop, and describe appropriate alternatives. . ."

## IV. ADEQUACY OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT

Appellants argue that the final EIS filed by the Corps falls short of the "detailed statement" required by § 102(2)(C) of NEPA for two reasons: (1) the statement contains an inadequate and inaccurate disclosure of fact; and (2) the statement lacks objectivity either on its face or because of the alleged bias of the District Director responsible for its preparation. We disagree.

The final EIS submitted by the Corps of Engineers in this case was prepared at an alleged cost of approximately $250,000, and is 200 pages in length. Attached to the statement are six appendices containing an additional 1500 pages.[9]

The main text is divided into eight divisions which describe, respectively, the project, the environmental setting without the project, environmental impact of the proposed action, adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, the relationship between short term uses of man's environment and the maintenance and enhancement of long term productivity, irrevocable or irretrievable commitment of resources which would be involved in the proposed action should it

8. The Senate report clarifies the relationship between the two sections:
"A statement of national policy for the environment—like other major policy declarations—is in large measure concerned with principle rather than detail; with an expression of broad national goals rather than narrow and specific procedures for implementation. But, if goals and principles are to be effective, they must be capable of being applied in action. S.1075 thus incorporates certain 'action—forcing' provisions and procedures which are designed to assure that all federal agencies plan and work toward meeting the challenge of a better environment."
S.Rep.No.91–296, 91st Cong., 1st Sess. 9 (1969).

9. Appendix I contains copies of all correspondence between the Corps and concerned public and private agencies and individuals, and the transcripts of several public hearings. Appendix II contains photographs of the project area. Appendix III discusses the local archeology, geology, botany, zoology, economic conditions, social relationships and human well-being, hydrology and water quality. Appendix IV contains a bibliography of all literature cited in the statement. Appendix V contains a transcript of the district court proceedings, and Appendix VI sets forth the qualifications of the personnel utilized by the Corps in preparing the statement.

be implemented, and coordination by the Corps with interested agencies, groups and individuals in the preparation of the statement.[10]

We have read the statement and found it to contain a full and accurate disclosure of the information required by § 102(2)(C).

Nevertheless, appellants contend that the EIS is partial and biased, either on its face or as the work product of a biased agency official. The latter claim is based upon statements allegedly made by Colonel Vernon W. Pinkey, District Engineer in charge of preparing the EIS until his retirement, before a local Chamber of Commerce meeting, assuring his listeners that the Gillham Dam would definitely be built.

■ We agree with appellants, as did the district court, that NEPA "requires the agencies of the United States government to objectively evaluate their projects." 342 F.Supp. at 1222. However, we do not agree with the view implicit in the contentions of appellants that NEPA requires agency officials to be subjectively impartial. The purpose of the procedural requirements of § 102 is

"to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in

that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal 'detailed statement' and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own."

Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, 449 F.2d 1109, 1114 (D.C. Cir. 1971). Thus NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements of § 102 to insure that "there is no way [the decision-maker] can fail to note the facts and understand the very serious arguments advanced by the plaintiffs if he carefully reviews the entire environmental impact statement." 342 F.Supp. at 1218. An institutional bias will most often be found when the project has been partially completed. Several courts have held that an agency involved in an ongoing federal project may approach the required compliance with § 102 differently from what might be required with respect to new projects. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal.1972); Morningside-Lenox Park Assn. v. Volpe, 334 F. Supp. 132, 145 (N.D.Ga.1971). Here, the Gillham Dam project was almost

10. Coordination on the new EIS began on July 2, 1971, with a letter to all known interested agencies, groups and individuals enclosing portions of a preliminary draft statement and requesting recipients to furnish any environmental data which should be used in its preparation. Subsequent letters enclosed new or revised sections of the preliminary draft. Responses received in reply to the request are summarized in this division, together with a response by the agency to each comment received. Public meetings were held on two occasions, and the comments and suggestions arising therein were also incorporated into the division. According to the EIS, comments were received from the following federal agencies: Na-

tional Oceanic and Atmospheric Administration, Environmental Protection Agency, Department of Health, Education and Welfare, Department of Recreation, Soil Conservation Service, Forest Service, Bureau of Sport Fisheries and Wildlife, Department of State, Federal Power Commission, Federal Highway Administration. State agencies: Archeological Survey, Soil and Water Conservation Commission, Department of Health, Department of Pollution Control and Ecology, Department of Planning, and Game and Fish Commission. Also heard from were over thirty conservation groups or other organizations, and ninety-one individuals.

two-thirds complete when the procedural requirements of NEPA went into effect on January 1, 1970. The federal funds expended, nearly ten million dollars, could not, in large part, be recouped if the project were abandoned. The Council on Environmental Quality (CEQ) has recognized that it may become impracticable to reassess the basic course of action where the project was initiated prior to the effective date of NEPA.[11] Accordingly, in the words of Judge Eisele,

> "it is possible for federal officials and federal employees to comply in good faith with [NEPA] even though they personally oppose its philosophy, are 'anti-environmentalists', and have unshakable, preconceived attitudes and opinions as to the 'rightness' of the project under consideration."

342 F.Supp. at 1223.

The test of compliance with § 102, then, is one of good faith objectivity rather than subjective impartiality. Committee for Nuclear Responsibility v. Schlesinger, 404 U.S. 917, 918, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971) (Douglas, J., dissenting from denial of injunction); Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 783 (D.C. Cir. 1971); Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, *supra*, 449 F.2d at 1115 n. 5; Citizens for Reid State Park v. Laird, 336 F.Supp. 783, 789 (D.Maine 1972); Environmental Defense Fund v. Hardin, 325 F.Supp. 1401, 1403 (D.D.C.1971).

■ Employing this standard, we are satisfied that the district court's findings and conclusion as to the objectivity of the EIS are supported by substantial evidence. Therefore we decline to hold that appellees have not complied in good faith with the procedural requirements of § 102(2)(C).

## V. DEVELOPMENT OF ALTERNATIVES

■ Appellants also contend that appellees have failed to develop important and reasonable alternatives to the proposed dam project, in violation of § 102(2)(D) of NEPA. Section 102(2)(D) requires that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." This provision follows and is in addition to the § 102(2)(C) requirement of a detailed statement discussing, *inter alia,* alternatives to the proposed action. This is not to suggest, however, that the more extensive treatment of alternatives required by § 102(2)(D) cannot be incorporated in the EIS. Indeed, "it is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives." Natural Resources Defense Council v. Morton, 458 F.2d 827, 834 (D.C. Cir. 1972). So too, the guidelines to the federal agencies issued by the CEQ explain the import of § 102(2)(D) under the general heading "Content of Environmental Statement." 36 Fed.Reg. 7724, 7725 (1971). The guidelines suggest:

> "A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential. Sufficient analysis of such alterna-

11. Guidelines for Federal Agencies under the National Environmental Policy Act, 36 Fed.Reg. 7724, 7727 (1971):

"11. *Application of section 102(2)(C) procedures to existing projects and programs.* To the maximum extent practicable the Section 102(2)(C) procedure should be applied to further major federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program."

tives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects."

Defendants have devoted thirty-seven pages of the 200-page impact statement to the discussion of alternatives, among them, total abandonment of the project. Particular attention is given to the suggestion that the Cossatot be preserved as a scenic river under the National Wild and Scenic Rivers Act, 16 U.S.C. § 1271 et seq. The economic benefits and environmental impact of each alternative are developed in great detail.

The most recent case to fully discuss § 102(2)(D) decided that the statute was subject to a construction of reasonableness. "The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite." Natural Resources Defense Council v. Morton, *supra,* 458 F.2d at 837.

We are reminded of the suggestion of the district court in this case that "[i]t is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, including, ultimately, the President and the Congress itself." 342 F.Supp. at 1217.

Again, we concur in the finding of the district court, implicit in its opinion,

that the EIS contains the study, development and description of reasonable alternatives required by § 102(2)(D).

## VI. JUDICIAL REVIEW OF SUBSTANTIVE MERITS

Finally, appellants contend that appellees' administrative determination that the dam should be constructed was arbitrary and capricious, contrary to the requirements of § 101 of NEPA, and reviewable by the courts under the Administrative Procedure Act, 5 U.S.C. § 706.

The district court found that NEPA "falls short of creating the type of 'substantive rights' claimed by the plaintiffs," and therefore "plaintiffs are relegated to the 'procedural' requirements of the Act." 325 F.Supp. at 755.

■ We disagree. The language of NEPA, as well as its legislative history, make it clear that the Act is more than an environmental full-disclosure law. NEPA was intended to effect substantive changes in decisionmaking. Section 101(b) of the Act states that agencies have an obligation "to use all practical means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" to preserve and enhance the environment. To this end, § 101 sets out specific environmental goals to serve as a set of policies to guide agency action affecting the environment.

■ Section 102(1) directs that the policies, regulations and public laws of the United States be interpreted in accordance with these policies to the fullest extent possible.[12] Section 102(2), of course, sets forth the procedural requirements of the Act, discussed previously in this opinion. The purpose is to *"insure that the policies enunciated in section 101 are implemented."* S.Rep. 91–296, 91st Cong., 1st Sess. 19 (1969).

12. The court in Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, 449 F.2d 1109, 1114 (D.C. Cir.1971), pointed out that "the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts."

(Emphasis added.) The procedures included in § 102 of NEPA are not ends in themselves. They are intended to be "action forcing." *Id.* at 9.[13]

■ The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives.

■ The application of the substantive principles of NEPA is to be made by the agency through a "careful and informed decisionmaking process." Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, *supra*, 449 F.2d at 1115. The agency must give environmental factors consideration along with economic and technical factors. "To 'consider' the former 'along with' the latter must involve a balancing process." *Id.* at 1113.

■ Given an agency obligation to carry out the substantive requirements of the Act, we believe that courts have an obligation to review substantive agency decisions on the merits. Whether we look to common law or the Administrative Procedure Act, absent "legislative guidance as to reviewability, an administrative determination affecting legal rights is reviewable unless some special reason appears for not reviewing." K. Davis, 4 Administrative Law Treatise 18, 25 (1958).[14] Here, impor-

13. Senate Report 91–296, 91st Congress, 1st Session (1969), states in part:
"1. Management of the environment is a matter of critical concern to all Americans. Virtually every agency of the Federal Government plays some role in determining how well the environment is managed. Yet many of these agencies do not have a mandate, a body of law, or a set of policies to guide their actions which have an impact on the environment. * * *
Section 101 of S.1075 rectifies this by providing a congressional declaration that it is the continuing policy and responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal planning and activities to the end that certain broad national goals in the management of the environment may be attained.
2. A statement of national policy for the environment—like other major policy declarations—is in large measure concerned with principle rather than detail; with an expression of broad national goals rather than narrow and specific procedures for implementation. But, if goals and principles are to be effective, they must be capable of being applied in action. S.1075 thus incorporates certain 'action-forcing' provisions and procedures which are designed to assure that all Federal agencies plan and work toward meeting the challenge of a better environment."
Mr. Henry M. Jackson, the principal Senate sponsor of NEPA, stated:
"If an environmental policy is to become more than rhetoric, and if the studies and advice of any high-level, advisory group are to be translated into action, each of these agencies must be enabled and directed to participate in active and objective-oriented environmental management. Concern for environmental quality must be made part of every phase of Federal action."
115 Cong.Rec. 29087 (1969).
In its Interim Guidelines of April 30, 1970, the CEQ stated that "[i]n essence the Section 102(2) (C) process is designed to insure that environmental considerations are given careful attention and appropriate weight in all Federal Government decision making." (Emphasis added.) In its most recent guidelines, 36 Fed.Reg. 7724, April 23, 1971, the Council stated that the objective of § 102(2) (C) is "to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action." The agencies must "assess in detail the potential environmental impact in order that adverse effects are avoided, and environmental quality is restored or enhanced, to the fullest extent practicable."
In view of the foregoing matter, we conclude that a purely mechanical compliance with the procedures of § 102 is not sufficient to satisfy the provisions of NEPA.

14. Agency action is subject to review on the merits under the Administrative Procedure Act, 5 U.S.C. §§ 701 and 706, except where there is a statutory prohibition on review or where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (1) and (2). In Citizens to Preserve Overton Park v.

tant legal rights are affected. NEPA is silent as to judicial review, and no special reasons appear for not reviewing the decision of the agency. To the contrary, the prospect of substantive review should improve the quality of agency decisions and should make it more likely that the broad purposes of NEPA will be realized.

The conclusion we reach with respect to substantive review of agency decisions is supported by the District of Columbia Circuit, the Second Circuit and the Fourth Circuit,[15] and by the analo-

Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed. 136 (1971), the Supreme Court construed the latter exception very narrowly:

"The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' "

Here, the substantive requirements of NEPA, which we have discussed above, provide law for the courts to apply in reviewing agency decisions. *See generally* Recent Developments, 60 Georgetown L.J. 1101 (1972); The Supreme Court, 1970 Term, 85 Harv.L.Rev. 315–326 (1971).

15. The District of Columbia Circuit in Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, 449 F. 2d 1109, 1115 (D.C.Cir.1971), stated:

"The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental value."

This position was reiterated in Natural Resources Council, Inc. v. Morton, 458 F. 2d 827, 838 (D.C.Cir.1972). Nothing in Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 783 (D.C.Cir.1971), indicates a departure from the principles enunciated in *Calvert Cliffs*. While the question of judicial review on the merits was not at issue in *Seaborg*, the court's opinion at 787 indicated reliance on *Calvert Cliffs* for the proposition that limited review was appropriate. In light of these cases, the contrary decision of the District of Columbia District Court in Environmental Defense Fund v. Hardin, 325 F.Supp. 1401 (D.D.C.1971), carries little weight.

The Second Circuit in Scenic Hudson Preserv. Conf. v. Federal Power Com'n, 453 F.2d 463, 468–469 (2nd Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) (Douglas, J., dissenting), reviewed the merits of a Federal Power Commission decision to determine if it was in compliance with NEPA. A reading of Judge Oakes' dissent, 453 F.2d at 482, as well as the dissent of Mr. Justice Douglas from the order denying certiorari, reveals that the only point in controversy was whether a standard of review stricter than the arbitrary or capricious test should have been used. Similarly, a three-judge court in City of New York v. United States, 344 F.Supp. 929 (E.D.N.Y.1972), made a limited review on the merits of an agency decision. The question as to whether or not a stricter standard of review should be used was left open. See also Hanly v. Mitchell, 460 F.2d 640 (2nd Cir. 1972). However, in the instant case, the appellants have argued only for the arbitrary and capricious test rather than any stricter standard of review.

The Fourth Circuit in Ely v. Velde, 451 F.2d 1130, 1138–1139 (1971), indicated that the purpose of impact studies is to create a record which can be reviewed to determine if the agency's actions were arbitrary. But subsequently, a district court of the Fourth Circuit indicated that no review on the merits is available, North Carolina Conservation Council v. Froehlke, 340 F.Supp. 222 (M.D.N.C. 1972), and that decision was affirmed by the Fourth Circuit in a brief per curiam opinion. North Carolina Conservation Council v. Froehlke, No. 72–1276 (4th Cir., May 2, 1972). Thus, the position of the Fourth Circuit on this issue is not completely clear.

The Tenth Circuit, however, has held that no review on the merits is available. National Helium Corporation v. Morton, 455 F.2d 650 (1971). See Bradford Township v. Illinois State Toll Highway Authority, 463 F.2d 537 (7th Cir. 1972).

District court decisions supporting a limited review on the merits are Lathan v. Volpe, 350 F.Supp. 262 (W.D.Wash., 1972); Brooks v. Volpe, 350 F.Supp. 269 (W.D.Wash., 1972); Citizens for Reid State Park v. Laird, 336 F.Supp. 783, 789 (D.Maine 1972); Morningside-Lenox Park Assn. v. Volpe, 334 F.Supp. 132, 145 (N.D.Ga.1971). While the court in Environmental Defense Fund, Inc. v. Corps of Engineers, 348 F.Supp. 916 (N.D. Miss.1972), indicated its belief that review on the merits was inappropriate, it

gous decision of the Supreme Court in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed. 136 (1971). The CEQ, surveying the state of the law in its third annual report, concluded "that, after an agency has considered environmental effects, its decision to act is subject to * * * limited judicial review." Environmental Quality (August, 1972).[16] Our conclusion is supported by scholarly opinion as well.[17]

■ The standard of review to be applied here and in other similar cases is set forth in Citizens to Preserve Overton Park v. Volpe, *supra*, 401 U.S. at 416, 91 S.Ct. at 824. The reviewing court must first determine whether the agency acted within the scope of its authority, and next whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making the latter determination, the court must decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision itself represented a clear error in judgment.

■ Where NEPA is involved, the reviewing court must first determine if

the agency reached its decision after a full, good faith consideration and balancing of environmental factors. The court must then determine, according to the standards set forth in §§ 101(b) and 102(1) of the Act, whether "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, *supra*, 449 F.2d at 1115.

> "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

Citizens to Preserve Overton Park v. Volpe, *supra*, 401 U.S. at 416, 91 S.Ct. at 824.

■ The trial court's opinion is in error insofar as it holds that courts are precluded from reviewing agencies' decisions to determine if they are in accord with the substantive requirements of NEPA. In light of our holding, there is no alternative but to subject the decision of the Corps to build Gillham Dam to review under the arbitrary and capricious

---

actually reviewed the conclusions of the Corps of Engineers in a careful and systematic manner.

16. The Council on Environmental Quality stated in its third annual report:
    "NEPA commands firmly that an agency must, to the fullest extent possible, take environmental values into account. It must also prepare environmental impact statements for major actions significantly affecting the quality of the human environment. If an agency fails to do either, it can be ordered to comply by a court. But neither NEPA's substantive duty nor its 102 process purports to dictate the agency's choice of a course of action in particular situations. The courts have uniformly said that, after an agency has considered environmental effects, its decision to act is subject to the limited judicial review afforded by the traditional arbitrary-or-capricious and substantial evidence tests."
    Environmental Quality 253–254 (August, 1972).

For the reasons stated by the Supreme Court in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414–415, 91 S.Ct. 814, 28 L.Ed. 136 (1971), we do not believe that the substantial evidence test is applicable here.

17. *See* Cohen and Warren, Judicial Recognition of the Substantive Requirements of the National Environmental Policy Act of 1969, 13 B.C.Ind. & Com.L.Rev. 685 (1972); Rheingold, A Primer on Environmental Litigation, 38 Brook.L.Rev. 113, 119–120 (1971); Sandler, The National Environmental Policy Act. A Sheep in Wolf's Clothing, 37 Brook.L.Rev. 139, 155 (1970); Sive, Some Thoughts on an Environmental Lawyer in the Wilderness of Administrative Law, 70 Colum.L. Rev. 612 (1970); Comment, Judicial Review of Factual Issues under the National Environmental Policy Act, 51 Ore.L.Rev. 408, 415–416 (1972); 25 Vand.L.Rev. 258, 270 (1972); 40 Geo.Wash.L.Rev. 558, 568–569 (1972); Jaffe, Book Review, 84 Harv.L.Rev. 1562 (1971).

standard. Ordinarily, we would remand the matter to the trial court for such review, but it is not necessary to do so in this case. The complete record, including the environmental impact statement and the transcript of the proceeding below, is before us. We have reviewed the record thoroughly and are convinced that even if all factual disputes are resolved in favor of the plaintiffs, the decision of the Corps to complete the dam cannot be set aside as arbitrary and capricious. See 28 U.S.C. § 2106. We have reached this conclusion after a serious consideration of the arguments in favor of and against completion of the project. In large part this had necessitated a balancing, on the one hand, of the benefits to be derived from flood control, and, on the other, of the importance of a diversified environment. We have also taken into account, as we must, that the overall project was authorized by Congress eleven years prior to the passage of NEPA, and was sixty-three percent completed at the date this action was instituted. Almost ten million dollars has been expended and would be lost if the project were completely abandoned now.

We therefore, affirm the judgment of the trial court for the reasons set forth in the opinion. Costs will be taxed equally to the parties.

## APPENDIX

The National Environmental Policy Act

### PURPOSE

Sec. 2. The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## TITLE I

### DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

Sec. 101. (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by title II of this Act.