**LIFE OF THE LAND et al., Plaintiffs,**

v.

**John VOLPE, Individually and in his capacity as Secretary of the United States Department of Transportation, et al., Defendants,**

and

**Kalihi-Palama Community Council et al., Defendants-Intervenors.**

**Civ. No. 72-3683.**

United States District Court, D. Hawaii.

Dec. 22, 1972.

---

Michael R. Sherwood, Brook Hart, Hart, Sherwood, Leavitt, Blanchfield & Hall, Honolulu, Hawaii, for plaintiffs.

Jon T. Miho, Asst. U. S. Atty., Robert K. Fukuda, U. S. Atty., Honolulu, Hawaii, for defendants Volpe, Shaffer and Webb.

Warren Higa, Deputy Atty. Gen., George T. H. Pai, State Atty. Gen., Honolulu, Hawaii, for defendant Matsuda.

Tobias C. Tolzmann, Honolulu, Hawaii, for defendants-intervenors Kalihi-Palama Community Council, Muraoka and Uyesugi.

Frank D. Padgett, Padgett, Greeley, Marumoto & Steiner, Honolulu, Hawaii, for defendants-intervenors General Contractors Assn. of Hawaii and Dillingham Corp.

## DECISION AND ORDER

SAMUEL P. KING, District Judge.

This case involves the administrative steps taken in authorizing the Reef Runway Project at Honolulu International Airport.[1]

The pending issue requires a decision as to whether a preliminary injunction shall be granted prohibiting further implementation of the project. A tempo-

---

1. "The proposed action involves Federal financial assistance pursuant to the Airport and Airway Development Act of 1970 to construct a new runway at Honolulu International Airport, Honolulu, Hawaii. The construction of this runway, generally referred to as the 'Reef Runway', consists of filling, grading and paving an airplane runway 12,000 feet long, 200 feet wide with a 1,000-foot long runway safety area on each end and 250-foot wide shoulders. The runway, to be located approximately 6,700 feet seaward of existing Runway 8–26, will include a protective structure 1,050 feet seaward of and parallel to the new runway to prevent storm wave damage." EIS page i.

rary restraining order was signed by Judge Pence just before the opening of bids for the construction of the runway. That order resulted in a suspension of the bidding process and is still in effect.

Plaintiffs are four organizations concerned with our natural environment and four individuals living in an area affected by this airport's operations. Defendants are the federal and state officials concerned with the project. Intervenors, as defendants, are the contractors who submitted bids for the construction of the runway, the General Contractors Association of Hawaii, two residents of Kalihi-Palama, and the Kalihi-Palama Community Council representing other residents of the affected area.

The operative statutes are the National Environmental Policy Act (NEPA), especially § 102(2)(C),[2] and the Airport and Airway Development Act (ADAP), especially § 16.[3]

The defendants appear to have complied with the requirements of these statutes.

NEPA demands that all agencies of the Federal Government

"include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." [4]

A detailed statement called a Final Environmental Impact Statement (EIS) was prepared. It purports to discuss the required matters.

ADAP demands that the Secretary of Transportation shall consult with the Secretaries of the Interior and Health, Education and Welfare, regarding environmental effects, and shall not authorize an airport project

"found to have adverse effect unless the Secretary shall render a finding, in writing, following a full and complete review, which shall be a matter of public record, that no feasible and prudent alternative exists and that all possible steps have been taken to minimize such adverse effect." [5]

The Secretary of Transportation obtained comments from the other two referenced departments and made the necessary finding.

■ Case law makes it clear, nevertheless, that a NEPA statement may be inadequate even though it contains material covering the statutory subjects of inquiry, and that the administrative process may be improper even though it includes the use of such a statement.[6]

So it is necessary to consider the several questions raised by plaintiffs as to

---

2. 42 U.S.C. § 4332(2)(C).

3. 49 U.S.C. § 1716.

4. Portion of 42 U.S.C. § 4332(2)(C). There are other provisions of 42 U.S.C. § 4332 which are pertinent and have been considered. For example, plaintiffs pointed to the requirement that copies of the EIS and of the comments and views of the appropriate federal, state, and local agencies "shall accompany the proposal through the existing agency review process" and argued that this was not done. The evidence showed that this was done.

5. Portion of 49 U.S.C. § 1716(c)(4). Other requirements of ADAP are mentioned below.

6. Administrative Procedure Act, 5 U.S.C. § 706(2) ; Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy

the adequacy of the EIS as measured by the standards developed by these cases.[7]

In doing so, I consider the statements in the EIS to be augmented by the attachments thereto and the references listed therein.[8] I also make distinctions among these cases based upon the character of the project.[9]

I have made these measurements. I find that the discussion set forth in the EIS complies with the requirements of NEPA, or that in those instances where additional discussion or disclosure should be set forth in the EIS the only delinquency is in draftmanship and not in any failure to consider the deleted matter as if it had been set forth in full in the EIS, or that the question raised by plaintiffs is one to which the EIS need not address itself.[10] Without attempting an exhaustive discussion of each of the matters as to which plaintiffs argue that the EIS is deficient, I shall illustrate the three categories mentioned.

Plaintiffs question the treatment in the EIS of the problem of noise pollution. But the EIS does discuss and graph the noise situation in some detail. The kinds of studies suggested by plaintiffs may be useful but are hardly necessary. They suggest a degree of certainty to which the situation does not lend itself.

Plaintiffs question the treatment in the EIS of air pollution. But building the runway does not permit air pollution beyond limits set by other laws which control air quality. The EIS does treat of the visual aspects of air pollution, and the evidence adduced indicates that nobody considered other aspects of air pollution to be an important problem until this action was filed, and that the government agencies charged with policing air quality felt that there would be no significant problem in this area. Perhaps the EIS should set forth in more detail the reasoning leading to this conclusion. But it cannot be said that air pollution was not considered by the decision makers.

■ Plaintiffs question the omission from the EIS of any discussion of the demographic impact of the traffic facilitated by the runway. Undoubtedly an EIS should discuss all of the significant primary environmental effects, and all of the substantial secondary environmental effects, of a project. How far beyond these effects an EIS should go may still be an open question, but there must be some limit. A "rule of reason" was suggested in argument.[11] In my

Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Lathan v. Volpe, 350 F.Supp. 262 (W.D.Wash.1972); Brooks v. Volpe, 350 F.Supp. 269 (W.D.Wash.1972).

7. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Environmental Defense Fund, Inc. v. United States Army Corps of Engineers, 470 F.2d 289 (8th Cir. 1972).

8. There are 24 documents, including the required comments by concerned federal agencies, among the references to the EIS. Many of these references ran well over 100 pages in length. The references were made available to interested members of the public, including plaintiffs, along with the EIS itself, before the public hearings which were held in connection with the project.

9. For example, an adequate EIS in connection with the establishment of a new airport might well differ quantitatively and qualitatively from an adequate EIS in connection with the expansion of an existing airport.

"On March 22, 1971, a public hearing was held . . . At the hearing, the State of Hawaii . . . presented evidence that the Reef Runway would:
. Reduce noise over Honolulu
. Reduce overflights over Honolulu
. Increase airfield capacity
. Provide an alternate runway during periods when the existing principal runway is under repair"
EIS page 8.

10. See Committee for Nuclear Responsibility v. Seaborg, 3 ERC 1126 (D.C.Cir. October 5, 1971); Conservation Council v. Froehlke, 340 F.Supp. 222 (M.D.N.C.1972), aff'd 4 ERC 1044 (4th Cir. May 2, 1972); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9 Cir. 1973).

11. See Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Committee for Nuclear Responsibility v. Seaborg, *supra* n. 10; EDF v. United States Army Corps of Engineers, *supra* n. 7.

opinion, requiring the kinds of demographic discussion suggested by plaintiffs is unreasonable in the context of this project.

The discussion in the EIS of alternatives needs separate consideration. Case law places special emphasis on this NEPA requirement and especially on the inclusion of abandonment of the project as an alternative.[12] The EIS here is very sketchy in this area. Yet it does appear from the evidence that the responsible officials in the decision making process and in the review processes did in fact consider many alternatives, including nonconstruction alternatives. I am persuaded that Mr. Thompson is right when he argues that a detailed discussion of national programs to reduce noise pollution and to improve operational efficiency should not have to be repeated in every EIS for every airport project. On the other hand, these statements are designed as much to alert and inform the public as to perform the function of the devil's advocate for the decision makers.[13] What is obvious and platitudinous to those who live with a program daily for several years is new and fearful to one who is confronted with the same program for the first time. While the EIS here may be minimally in technical compliance with statutory requirements, it leaves much to be desired as an example of the art of communication.

Mention should be made here of the extensive consideration of this project over a period of some 10 years. Planning did not begin with NEPA, and while some of the present vocabulary is new, the concerns to which planners addressed themselves are not. A special task force on the airport development, involving responsible local, state and federal officials and members of the public, met about once a month for some 4 years, and wound up recommending the reef runway. The secretary of that committee testified to the many matters discussed. Because of the input from this committee's members and from other sources, the original plan was in fact materially altered, as, for example, by the change from a straight sea wall to an S-curve sea wall.

Again, it should be noted that many of the effects feared by plaintiffs can be alleviated or prevented, if they eventuate, even if construction as planned proceeds to completion.

Other questions were raised with respect to compliance with NEPA and ADAP requirements.

I ruled previously that NEPA does not prevent the employment of a private contractor who has a financial stake in the project to draft an EIS. NEPA does require that the final EIS be sufficiently reviewed and considered by the "responsible official" to insure that it was a part of the decision making process.[14] Here the evidence shows that FAA officials did in fact work together with state officials and a private contractor in the preparation of the EIS and gave it close attention.[15]

The absence of a national airport development system plan is proposed as a basis for prohibiting this development.[16]

---

12. Natural Resources Defense Council, Inc. v. Morton, *supra* n. 11.

13. The cases emphasize the functions of the EIS in (1) providing evidence that the decision-making process required by NEPA was in fact followed, and (2) giving the decision makers who are removed from the initial proposal sufficient data from which to make their own determination of costs and benefits. See Brooks v. Volpe, *supra* n. 6.

14. EDF v. U. S. Army Corps of Engineers, *supra*, n. 7; Greene County Planning Board v. Federal Power Com'n, 455 F.2d 412 (2d Cir. 1972); Upper Pecos Association v. Stans, 452 F.2d 1233 (10th Cir. 1971).

15. Plaintiffs assert that the "comments and views of the appropriate Federal, State, and local agencies" did not "accompany the proposal through the existing agency review processes" as required by 42 U.S.C. § 4332 (2)(C). The short answer to this assertion is that they did.

16. 49 U.S.C. § 1716(a): ". . . No project application shall propose airport development other than that included in the then current revision of the national airport system plan formulated by the Secretary under this subchapter . . . "

The evidence is that there is such a plan although it has not yet been published.

The certificate of the governor [17] and the finding of the Secretary of Transportation[18] are said to be unsupported. Assuming without deciding that these executive actions are subject to judicial review, there is ample support in the record for the proposition that they are deliberate conclusions based upon ample information.

█ Under all of the circumstances and upon the evidence adduced it is my opinion that it is improbable that plaintiffs will prevail upon the merits of their complaint. Therefore, a preliminary injunction will be denied.[19] The temporary restraining order is lifted.

█ I will entertain requests for additional findings of fact and conclusions of law.[20]

17. 49 U.S.C. § 1716(e)(1): "The Secretary shall not approve any project application for a project involving airport location, a major runway extension, or runway location unless the Governor of the State in which such project may be located certifies in writing to the Secretary that there is reasonable assurance that the project will be located, designed, constructed, and operated so as to comply with applicable air and water quality standards. . . ."

18. 49 U.S.C. § 1716(c)(4). See quote referenced to n. 5 *supra*.

19. The matter came on before me for hearing on a permanent injunction on March 29, 1973. No further substantial evidence was adduced, and the matter was submitted on the record made at the hearing on a preliminary injunction with some additional offerings. I reaffirmed my earlier decison, denied a permanent injunction, and denied the request for a stay pending appeal. (There were some changes in parties between December 22, 1972, and March 29, 1973. Following the December 22, 1972, decision, bids were opened, and a contract was awarded. The unsuccessful bidders withdrew as defendants-intervenors herein. There was earlier a passing suggestion that there might be a standing issue, but inasmuch as at least one plaintiff had standing the issue was not pursued. I was prepared to hold that all plaintiffs had standing. Plaintiffs had sought to prevent intervention by the defendants-intervenors, but

I earlier ruled against them and allowed the intervention.)

20. Defendants-intervenors sought to avoid plaintiffs' challenge by charging them with laches, citing Clark v. Volpe, 342 F.Supp. 1324 (E.D.La.1972), aff'd 461 F.2d 1266 (5th Cir. 1972). The appellate court cited Ragland v. Mueller, 460 F.2d 1196 (5th Cir. 1972), which held that it was unreasonable to apply NEPA retroactively to a road project when 16 of 20 miles had already been fully completed and the right-of-way for the remaining 4 miles had already been acquired. I ruled previously that plaintiffs were not barred by laches. There was no showing that plaintiffs' timing constituted unreasonable delay. Rather, the evidence showed that plaintiffs used the period between approval of the EIS on February 29, 1972, and the filing of this action on November 8, 1972, to pursue available administrative remedies. The court may even decline to invoke laches in environmental cases "because of the public interest status accorded ecology preservation by the Congress." Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 (4th Cir. 1972). See Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 246 (M.D.Pa.1970), aff'd 454 F.2d 613 (3rd Cir. 1971); Harrisburg Coalition Against Ruining the Environment v. Volpe, 330 F.Supp. 918, 924 (M.D.Pa.1971); Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971); Natural Resources Defense Council v. Grant, 341 F.Supp. 356 (E.D.N.C.1972).