SIERRA CLUB, a corporation, et al., Appellants,

v.

Robert F. FROEHLKE, Secretary of the Army, et al., Appellees.

No. 75–1252.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1975.

Decided April 23, 1976.

Alan C. Kohn, St. Louis, Mo., for appellants; Cynthia C. Bottini and Kohn, Shands, Elbert, Gianoulakis & Giljum, St. Louis, Mo., on brief.

Michael A. McCord, Atty., Dept. of Justice, Washington, D. C., for appellees; Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, George R. Hyde, Attys., Dept. of Justice, Washington, D. C., and Donald J. Stohr, U. S. Atty., and David W. Harlan, Asst. U. S. Atty., St. Louis, Mo., on brief.

John W. Howald and James E. Bowles, Hillsboro, Mo., for amicus curiae, Meramec Basin Assn.

Robert J. Golten and Oliver A. Houck, Attys., Natl. Wildlife Federation, Washington, D. C., for amicus curiae, Natl. Wildlife Federation.

Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This case is an appeal from a district court judgment denying injunctive and declaratory relief. The plaintiffs-appellants, Sierra Club and several named individuals, seek to enjoin construction of the Meramec Park Lake Dam and any other dams planned in the Meramec Basin. The District Court denied such relief. We affirm.

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

The original complaint in this action was filed on September 25, 1972 to halt construction of the Meramec Park Dam and any other proposed dams in the Meramec Basin. The plaintiffs included Sierra Club, a nonprofit California corporation, the Ozark Chapter of which includes the State of Missouri. It has headquarters in St. Louis. Sierra Club is an organization dedicated to the preservation and enjoyment of natural resources. Its members use the Meramec Basin, specifically the Meramec Park Lake Project area, for recreational, scientific, and educational pursuits on an individual and group basis.

There are also four individual plaintiffs who own land in the Meramec Basin. Plaintiffs Clark and Kathryn Springer own land two miles upstream from the Meramec Park Dam site which will be acquired either by voluntary sale or eminent domain proceedings. Plaintiff Howard O. Patten likewise owns land, situated at the juncture of the Huzzah and Meramec Rivers, scheduled for purchase or condemnation. Finally Plaintiff Olga Smith owns land on the Meramec River. Although her land is not threatened with condemnation in order to build the Meramec Park Lake Dam, her land will be flooded if the Virginia Mines Dam is built as is called for by phase two of the overall Meramec Basin Plan. (The construction of Meramec Park Lake Dam is phase one of a three part plan.)

The three defendants were all officers of the United States Army when this action was filed. Robert F. Froehlke was Secretary of the Army; Lieutenant General Frederick J. Clarke was Chief of the Army Corps of Engineers; and Colonel Guy E.

Jester was District Engineer of United States Army Engineer District, St. Louis, Missouri. In those positions, the three defendants were responsible for the construction of the Meramec Park Lake Dam and for the overall Meramec Basin Plan.

The Meramec Basin Association was granted leave to file briefs as amicus curiae both at trial and on appeal in support of construction of the Meramec Park Lake Dam.

The original complaint alleged violations of the National Environmental Policy Act of 1969[1] (hereafter NEPA), the Flood Controls Acts of 1936,[2] 1938,[3] and 1966,[4] and the Fish and Game Wildlife Coordination Act of 1958.[5] On December 29, 1972, the plaintiffs moved for a summary judgment based on the inadequacy of the original environmental impact statement (hereafter EIS), dated November 6, 1970. The motion was denied without prejudice on the representation that a revised environmental impact statement was being prepared. The final statement, filed on September 23, 1973, is a four volume work of nine sections which greatly expanded the detail of discussion contained in the original impact statement.

On December 23, 1973, Sierra Club amended its complaint to allege, in addition to its previous claims, violations of the Federal Water Pollution Control Act of 1972,[6] the Federal Water Resources Planning Act of 1965,[7] and the Federal Water Project Recreation Act of 1965.[8] Finally, on September 20, 1974 Sierra Club was granted leave to amend its amended complaint to allege violations of the Endangered Species Act of 1973.[9]

After a two and one-half day trial, the district court,[10] in an order and opinion en-

1. 42 U.S.C. § 4321 et. seq.

2. Act of June 22, 1936, Ch. 688, § 1 et. seq., 49 Stat. 1570.

3. Act of June 28, 1938, Ch. 795, § 1 et. seq., 52 Stat. 1215.

4. Act of Nov. 7, 1966, Pub.L. No. 89–789, § 201 et. seq., 80 Stat. 1418.

5. 16 U.S.C. § 661 et. seq.

6. 33 U.S.C. § 1251 et. seq. (Supp.1975).

7. 42 U.S.C. § 1962 et. seq.

8. 16 U.S.C. § 460l–12 et. seq.

9. 16 U.S.C. § 1531 et. seq. (effective 12/28/73). This Act was not in effect when the final environmental impact statement was filed or when this action was first begun.

10. The Honorable H. Kenneth Wangelin, U. S. District Judge for the Eastern District of Missouri.

tered March 19, 1975, found against the plaintiffs on all counts and denied their request for declaratory and injunctive relief, holding in part:

In conclusion, this Court is of the opinion that it can have no other holding, but to enter judgment for the defendants. In every instance of alleged statutory violation, or other alleged failings of the defendants with regards to the Meramec Park Reservoir, the defendants have carried the burden of proof or have indicated to this Court's satisfaction that no violation has occurred.[11]

This appeal followed. On appeal, Sierra Club has confined its claims of error to alleged violations of NEPA and the Endangered Species Act of 1973. It argues that the NEPA is being violated in that the revised EIS was inadequate in its discussion of alternatives to the proposed project, and in its failure to consider the entire Meramec Basin Plan and not simply the Meramec Park Lake Project. Moreover, with respect to the Indiana bat, an endangered species, it is charged not only that the EIS discussion was inadequate, but that there were as well violations of the Endangered Species Act of 1973. The decision to proceed with the dam construction is therefore argued to us to be arbitrary and capricious.

The proposed Meramec Park Lake Dam will be located in the Meramec Basin, encompassing a watershed of some 4000 square miles. Generally speaking, it is in an area running southwest from St. Louis for approximately 120 miles. At the present time there is no major dam or reservoir on the river, or its principal tributaries. It comprises areas of great natural beauty, of rugged terrain, as well as of pastoral sites, and of natural caves and springs. But there is another side to the

coin. The flow of the river is extremely variable. During drought periods the streams in the basin do not carry enough water to provide adequate dilution of the wastes that empty into them.[12] At flood periods it is highly destructive. Major floods have occurred on the average of about once every six years, although portions of the bottom lands have experienced flooding almost annually. "Rural slum" areas are prevalent in some of the river stretches. There is a need to supply the recreational needs of the St. Louis Metropolitan Area. All of these considerations, and more, we find discussed in great detail in the EIS. It is obvious, and has been for years, that the problems presented demand solution, although it is equally obvious that for every weight on one side of the scales there is at least some counter-weight.

The above-described project is part of a comprehensive plan for flood control in the Upper Mississippi River Basin first authorized by Congress in the River and Harbor Flood Control Act of 1938.[13] A detailed plan was prepared and submitted on the Meramec Basin in 1949, but was deferred due to a lack of general acceptance. In 1958, public interest led to a review and updating of the 1949 plan by the Corps of Engineers, culminating in the authorization by Congress of a comprehensive plan for the Meramec Basin in the Flood Control Act of 1966.[14]

In addition to the Meramec Park and Union reservoirs, which were first authorized in 1938, the 1966 plan authorized three additional reservoirs, Pine Ford, Irondale, and I-38 as well as 19 angler-use sites, all of which are to be located in the Meramec Basin. The Meramec Park Lake will be formed by the construction of an earth and rock-fill dam on the Meramec River. The dam site will be located 108.7 miles above

11. *Sierra Club v. Froehlke*, 392 F.Supp. 130, 144 (E.D.Mo.1975).

12. H.R.Doc. No. 525, 89th Cong., 2d Sess. 19 (1966). This is the comprehensive updated 1949 plan on the Meramec River Basin submitted to Congress in 1966 and referred to *infra*. See text accompanying note 14.

13. Act of June 28, 1938, Ch. 795, § 4, 52 Stat. 1218.

14. Act of Nov. 7, 1966, Pub.L. No. 89–789, § 201 *et. seq.*, 80 Stat. 1418.

the junction of the Meramec and Mississippi Rivers and two miles east of Sullivan, Missouri. The water impoundment created by the dam will be known as the Meramec Park Lake. The lake will have a capacity of one million acre feet and will have a surface area of 12,600 acres at normal pool (675 feet above sea level) and 23,000 acres at flood pool (709 feet above sea level).

The Meramec Park Lake Project has been in the real estate acquisition category since 1968. Construction was begun in July 1974, and the construction of an administrative building, an overlook, and access road to the site is now approximately 90 per cent complete. The project is scheduled to be complete and operational by June of 1980. The primary benefits of the project are expected to be flood control, water supply, water quality (pollution abatement), recreation, fish and wildlife, and navigation.

The first phase of the overall Meramec Basin Plan calls for dams on the Bourbeuse and Big Rivers in addition to that on the Meramec River. The Union Dam is projected for the Bourbeuse River, approximately twenty miles downstream from the Meramec Park Lake Dam. Further upstream on the Bourbeuse is to be located the I-38 Lake and Dam. On the Big River, the Irondale Lake and Dam are planned, and further downstream the Pine Ford Lake and Dam. The Bourbeuse and Big River both flow into the Meramec River southwest of St. Louis, and the Meramec Dam, Union and Pine Ford Dams will act together as a system to prevent flood damage in the lower Meramec Basin area. The situation with respect to the funding, the precise locations, and the specific details of dams other than

the Meramec Park Lake Dam will be discussed hereinafter.

As to compliance with NEPA, the plaintiffs assert that the EIS "Contained an Inadequate Discussion of the Alternative of Flood Plain Acquisition." The relevant directions of the Congress with respect to alternatives are found in § 102 of NEPA, 42 U.S.C. § 4332:

The Congress authorizes and directs that, to the fullest extent possible:

\* \* \* \* \* \*

(2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,[15]

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

\* \* \* \* \* \*

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;[16]

15. A section-by-section analysis of the conference report on NEPA approved by the Senate and House of Representatives summarized this section as: "[t]he alternative ways of accomplishing the objectives of the proposed action and the results of not accomplishing the objectives." 115 Cong.Rec. 40420 (1969) (introduced into the record by Senator Jackson, Chairman of the Senate Interior Committee and floor manager of the bill.) *See also* legislative history in *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (8th Cir. 1972). (Footnote ours.)

16. This section was analyzed in the conference report on NEPA, *see* note 15, *supra*, to require the following:

Wherever agencies of the Federal Government recommend courses of action which are known to involve unresolved conflicts over competing and incompatible uses of land, water, or air resources, it shall be the agency's responsibility to study, develop, and describe appropriate alternatives to the recommended course of action. The agency shall develop information and provide descriptions of the alternatives in adequate detail for sub-

The EIS submitted in this case[17] is contained in four volumes, pages not consecutively numbered. Since the challenge here considered is to the "Alternatives" we turn to Part Five, Paragraph No. III, page FIVE–14 *et seq.*, entitled "Alternatives Open for Consideration." The alternatives there considered refer to both nonstructural and structural alternatives, as well as combinations thereof. These are grouped under subheads as found in the footnote.[18]

sequent reviewers and decisionmakers, both within the executive branch and in the Congress, to consider the alternatives along with the principal recommendation.

115 Cong.Rec. 40420 (1969). (Footnote ours.)

17. The Council on Environmental Quality, created under NEPA, has formulated guidelines to assist federal agencies in the preparation of environmental impact statements for proposed federal projects under its duty "to review and appraise the various programs and activities of the Federal Government in light of the policy set forth in Subchapter I [Policies and Goals—National Environmental Policy] of this chapter . . . ." 42 U.S.C. § 4344(3). We have accorded those guidelines substantial weight in reviewing compliance with NEPA. *See, e. g. Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1321 (8th Cir. 1974) (en banc); *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 17 (8th Cir. 1973); *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 349 (8th Cir. 1972). The latest guidelines in effect when the revised impact statement was filed are found at 40 C.F.R. § 1500 (Aug. 1, 1973). With respect to alternatives to the proposed action, those guidelines provide as follows:

(4) Alternatives to the proposed action, including, where relevant, those not within the existing authority of the responsible agency. (Section 102(2)(D) of the Act requires the responsible agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources"). A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential. Sufficient analysis of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects. Examples of such alternatives include: the alternative of taking no action or of postponing action pending further study; alternatives requiring actions of a significantly different nature which would provide similar benefits with different environmental impacts (e. g., nonstructural alternatives to flood control programs, or mass transit alternatives to highway construction); alternatives related to different designs or details of the proposed action which would present different environmental impacts (e. g., cooling ponds vs. cooling towers for a power plant or alternatives that will significantly conserve energy); alternative measures to provide for compensation of fish and wildlife losses, including the acquisition of land, waters, and interests therein. In each case, the analysis should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative. Where an existing impact statement already contains such an analysis, its treatment of alternatives may be incorporated provided that such treatment is current and relevant to the precise purpose of the proposed action.

40 C.F.R. § 1500.8(a)(4).

18.

| Para. No. | Title |
|---|---|

PART FIVE—ALTERNATIVES

I  Introduction

II  The Meramec River Comprehensive Basin Study
    A. Reservoir site criteria
    B. Sites considered
      1. Main stream sites
      2. Headwater and tributary sites
    C. Selection of most suitable sites
      1. Main stream sites
      2. Headwater and tributary sites
    D. Storage requirements and capabilities considered
      1. General
      2. Flood control
      3. Water supply and water quality control
      4. Augmented flow requirements in the lower basin from the reservoir system
      5. Recreation
      6. Fish and wildlife

■ With specific reference to plaintiffs' contention that the statement is inadequate with respect to the alternative of flood plain acquisition, a land planning expert was presented to the court.[19] It was his thinking that the nonstructural alternatives had not been fully analyzed or considered, nor had there been economic analysis of the "costs and benefits of flood plain acquisition." There was contrary testimony, such as that flood plain acquisition was not "a reasonable and viable alternative to the presently planned project" and that its total cost would be approximately one hundred forty three million dollars.[20] The defendants' position on this aspect of the case, contained in the EIS, was that flood plain acquisition was impractical because of a) the difficulty and cost of relocating the residences, utilities, and transportation facilities in the Meramec River flood plain, b) the vigorous opposition from those in the urbanized lower areas, c) the adverse effect upon the income-producing capability of the land, and d) the elimination of private, taxable income from the area, as well as the tax base for government purposes. The EIS contains a full discussion and evaluation of possible alternatives. The reasons for the choice of course of action are clear. We cannot say that the trial court's conclusions, that the EIS discussion of flood plain alternative was adequate and that flood plain acquisition was not a reasonable alter-

7. Water power
E. Summary
III Alternatives open for consideration
A. General
B. Nonstructural alternatives
   1. Abandonment of construction of Meramec Park Lake and substitute no alternatives
   2. Preservation of the Meramec River for recreational and scientific purposes
   3. National recreation area proposals
      a. Jefferson County Planning and Zoning Commission and St. Louis County Planning Commission
      b. Bureau of Outdoor Recreation and National Park Service
   4. Nonstructural flood damage protection measures
      a. General
      b. Flood proofing
      c. Flood plain insurance
      d. Flood plain evacuation
      e. Flood warning system
      f. Flood plain zoning
C. Structural alternatives
   1. Dry lake
   2. Upstream multi-purpose lakes
   3. Levee protection
   4. Water supply alternatives
   5. Combination headwater lakes and dry lake
D. Combination of nonstructural and structural measures
   1. General
   2. Alternative of upstream flood detention reservoirs with flood plain insurance and zoning and levees
   3. Alternative of preservation, zoning, and construction of main stream reservoirs

---

**19.** This witness had previously presented substantially the same information to the Congress prior to the appropriation Congress made for fiscal 1974.

**20.** This represents a recalculation of the total cost of acquiring and evacuating the flood plain. The EIS had estimated that the land and

native to the proposed action, are clearly erroneous.

■ Plaintiffs also argue that the EIS gave inadequate consideration to the effects of the project on the Indiana bat, *Myotis sodalis*, a species of life found in the Meramec Basin.[21] Again we confront the standards to be expected of the discussion and disclosures reasonably to be found in an adequate EIS. One of the problems here is that there is little precise knowledge in the scientific world regarding the behavior and habitat of the bat. Two doctoral theses were described as the only "scientific literature" on the subject. Ongoing studies are being conducted, and the Corps has cooperated with the Department of the Interior with respect thereto.[22] The EIS before us points out without equivocation that such bats are found in the area [23] and that some will be drowned if hibernating in caves which are flooded by the pool of the reservoir.[24] Although the EIS is somewhat brief on the subject of the Indiana bat, it is sufficient to put interested persons, including decisionmakers, on notice as to significant consequences to be expected from the proposed action. *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 853 (8th Cir. 1973). In view of the limited knowledge available as to this bat and its characteristics, we cannot fault the agency for failure to discuss it in more detail.[25] Reasonable notice of the environmental consequences was clearly given and decisionmakers have sufficient information to aid in their substantive decision whether to proceed with the project in light of its environmental consequences. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1282 (9th Cir. 1974). We agree with the trial court that the EIS statements regarding the bat meet

structures in the Meramec flood plain "now have a value of $53,330,000 for the 32,900 acres directly involved." The Corps' witnesses admitted at trial that this figure was too low, even for the partial cost of acquiring the land and structures.

21. The argument made as to violation of the Endangered Species Act of 1973, 16 U.S.C. 1531 *et seq.* by this project's impact on the Indiana bat is a separate facet of the bat problem and will be considered hereinafter.

22. Further steps, including placing an expert under contract to the Corps and the initiation of studies on the effects of seismic shocks on the bats, have been undertaken since the conclusion of the trial. (Def.Br. p. 29.)

We made inquiry upon oral argument, as to whether the continuing activities in the dam area might constitute a threat to the survival of the species pending a completion of the studies being made. We have reviewed the reports submitted in response to our question and are satisfied that such cannot reasonably be said to be the case. Significant, also, in this regard, is the failure of the plaintiffs to establish that seismic testing in the project area has adversely affected the bat. Although there was testimony that blasting had taken place within 450 to 3000 feet of Cave 005, the plaintiffs proffered no testimony as to any deleterious effects on the bat from such blasting. We also note from the reports submitted that defendants are fully aware of the problems presented and are, with respect to some of the inhabited caves in

the area, studying the feasibility of installing protective devices to keep exploring humans out of the caves, since their activities are as detrimental (or more) to the bat than the construction activities presently under way.

23. *See inter alia,* EIS at TWO–51, TWO–134, TWO–166, THREE–51 and FOUR–5.

24. The cave situation will be described in more detail in our consideration of the defendants' alleged violations of the Endangered Species Act, *infra.*

25. We note that on-going studies are being made, *see* text accompanying note 22, *supra,* the last of which is not scheduled to be completed until January, 1977. A similar situation was faced in *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army,* 325 F.Supp. 749 (E.D.Ark.1971), *dismissed,* 342 F.Supp. 1211, *aff'd* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973) where several expert witnesses commented at trial on the need for studies on stream life found in the Cossatot River proposed to be dammed. The studies were estimated to take several years in total to complete. The District Judge found that it was sufficient if the opinions alone as to the need for the study were made part of the EIS. "The decisionmakers can then determine whether to proceed without such a study or to postpone the project while such a study is being undertaken." *Id.* at 760. Similar notice to the decisionmakers has been given here.

the requirements of NEPA under the facts presented by the record.

Plaintiffs contend also that the EIS filed by defendants should have considered the entire Meramec Basin Plan and not the Meramec Dam Project alone. A resolution of this issue requires a determination of the purpose and projected functioning of the Meramec Dam with relation to the entire area. To some extent the facts we allude to at this point will be repetitive of those previously stated, but will be confined to those particularly applicable to the issue presented.

The Meramec Park Lake Project, although first proposed in 1930, was not authorized by the Congress until June 28, 1938.[26] Review of earlier planning was initiated in fiscal 1961, finally culminating, through administrative steps, in a plan submitted to the Congress on October 17, 1966.[27] The project so proposed was eventually approved in the Flood Control Act of 1966,[28] which specifically authorized the construction of Pine Ford, Irondale and I–38 Lakes and included in the plan for the basin, Meramec Park Lake and Union Lake, which had previously been authorized by the Flood Control Act of 1938. Meramec Park Lake is presently under construction [29] and Union Lake "is ready for the appropriation of construction funds." No such funds have been appropriated for Pine Ford, Irondale or I–38 Lakes.

As for the Meramec project, land acquisition funds were first appropriated in fiscal 1968, and construction funds in August 1973. Its drainage area is about 1500 square miles, controlling the run-off from that area, and thus contributing to some degree to the satisfaction of other project purposes; a situation, it was testified, that would not be altered by the nonconstruction of the other projects, Union, Pine Ford, I–38, or Irondale. In short the Meramec project "doesn't act like one leg of a three-legged stool," its share of the overall project purposes not being dependent on any other impoundment. There is no assurance, it was testified, that "these other lakes will ever be built," or where, or with what characteristics, and it seems clear that environmental impact of the other reservoir projects cannot be determined to a reasonable degree in the absence of detailed planning therefor.

The courts have been presented with the issue of "segmentation" of impact statements in various contexts [30] and we do not propose to attempt the impossible, namely, the enunciation of a general rule that will cover all cases. The crucial dependence is upon the facts before the court in the particular case *sub judice*. Where it is found that the project before the court is an essentially independent one, an EIS for that project alone has been found sufficient compliance with the act. In such case there is no irretrievable commitment of resources beyond what is actually expended in an individual project. *Sierra Club v. Morton*, 169 U.S.App.D.C. 20, 514 F.2d 856, 887 (1975) (MacKinnon, J., *dissenting*), cert.

---

26. *See* Flood Control Act of 1938, Ch. 795, § 4, 52 Stat. 1218.

27. H.R.Doc.No.525, 89th Cong., 2d Session (1966).

28. Act of Nov. 7, 1966, Ch. 789, § 201 *et. seq.*, 80 Stat. 1418.

29. The testimony before the District Court on this point was that the Congress, in providing for the Meramec Park Lake construction, "was endeavoring to satisfy the needs of the Basin for Flood control, recreation, water supply, low flow augmentation in the Meramec River, the lower Meramec River in the interest of water quality, fish and wildlife enhancement, some navigation and area redevelopment." Testimony of Mr. Leo T. Briece, Head of the Meramec Basin Section and Project Coordinator, United States Army Engineer District, St. Louis, Missouri.

30. *See e. g., Jones v. Lynn*, 477 F.2d 885, 890 (1st Cir. 1973); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 934 (2d Cir. 1974), cert. granted, judgment vacated & remanded sub nom. *Coleman v. Conservation Society of Southern Vermont, Inc.*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29, 44 U.S.L.W. 3199 (1975); *Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir. 1974).

*granted sub nom. American Electrical Power System v. Sierra Club,* 423 U.S. 1047, 96 S.Ct. 772, 46 L.Ed.2d 635, 44 U.S.L.W. 3397 (1976). Thus in *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974), the Fifth Circuit reversed a district court decision which had held that construction of the Wallisville Reservoir be delayed pending the preparation of an EIS covering the entire Trinity Basin Project. The court held that:

> We conclude that the Wallisville and Trinity River Projects are not interdependent. The nexus between the projects is not such as to require an EIS evaluation of the Trinity Project as a condition precedent to an EIS evaluation of Wallisville. The Wallisville EIS should speak for itself. Wallisville is a separate viable entity. It should be examined on its own merits. Although it has been made compatible in certain of its features with Trinity it is not a mere component, increment, or first segment of Trinity. The court erred in so holding.

499 F.2d at 990.

Similar was the holding in *Trout Unlimited v. Morton, supra.* A project known as the "Teton Dam and Reservoir Project" had been divided into two "phases." It was the position of the plaintiffs that the EIS prepared for the initial phase was inadequate because it did not discuss the environmental impact of the Second Phase. In rejecting the argument made, the court held:

> The appellants contend that the EIS is fatally inadequate because it does not discuss the environmental impact of the Second Phase. They rely upon cases which hold that a series of interrelated steps constituting an integrated plan must be covered in a single impact statement. We believe these authorities are inapposite and that the failure of the EIS to discuss the Second Phase does not render it inadequate. The distinction between those situations in which it has been held that the EIS must cover subsequent phases and that before us is that here the First Phase is substantially independent of the Second while in those in

which the EIS must extend beyond the current project, that project was dependent on subsequent phases. The dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken. This is not the case here. (Footnotes omitted.)

509 F.2d at 1285.

In the same vein was our holding in *Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 19 (8th Cir. 1973) wherein, considering an EIS limited to only a 14-mile segment of a highway as insufficient, we held:

> The crucial question here is whether the 14-mile segment of F–518–4 is an appropriate segment for the present EIS. We do not think it is. *It does not have an independent utility of its own,* * *, which would require that it end in major termini, *i. e.* present major highways or cities. (Emphasis added.)

Plaintiffs' reliance upon such cases as *Scientists' Institute for Public Information v. AEC* (SIPI), 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973) and *Atchison, Topeka and Santa Fe Railway Co. v. Callaway,* 382 F.Supp. 610 (D.D.C.1974) is misplaced. The cases are inapposite. In the SIPI case, an EIS was required for continued research and development on the AEC's Liquified Metal Fast Breeder Reactor (LMFBR) Program covering foreseeable environmental effects if such a reactor were put into future use. The court stressed that the LMFBR had no independent significance absent such future uses. The *Santa Fe* case considered proposed Locks and Dam 26 which would expand the capacity of the entire Upper Mississippi River Navigation System, including the Illinois Waterway from 46 to 190 million or more tons, it being, "in essence, the decision to expand the capacity of the entire system." The court, in commenting upon *Sierra Club v. Callaway, supra,* noted the significant factual differences which, as we have noted, is the crucial determination. "Thus," continued the court, "Locks and Dam 26 is to the other parts of the Upper Mississippi system what the Trinity River

Project is to the Wallisville Project, not vice versa." [31]

■ It was the holding of the trial court on this phase of the case that:

It is clear that, while each reservoir has an incremental effect in meeting the total flood control and water quality needs of the Meramec River Basin, the proposed dams would operate independently of each other. It is clear that each reservoir, acting alone, would satisfy a portion of the river basin's needs. The evidence further shows that a determination of whether or not any of the other proposed reservoirs will ever be built would require speculation on the part of this Court.

392 F.Supp. at 135.

Upon this record we are not persuaded of clear error in such holding.

With respect to the charges as a whole made by the plaintiffs as to the inadequacy of the EIS, it is well to go back to fundamentals, so to speak, and examine its purposes. These were outlined, in general, as follows:

Congress contemplated that the Impact Statement would constitute the environmental source material for the information of the Congress as well as the Executive, in connection with the making of relevant decisions, and would be available to enhance enlightenment of—and by— the public. The impact statement provides a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action. (Footnotes omitted.)

*Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (1972).

The contents of any particular statement will, of course, depend upon the situation presented. As we held in *Iowa Citizens for*

*Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973):

[T]he environmental statement "to some extent must be examined in light of the particular facts and circumstances surrounding the project * * * in order to determine its sufficiency. The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project." The discussion of environmental effects need not be "exhaustive" but rather need only provide sufficient information for a "reasoned choice of alternatives." *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). *See Sierra Club v. Froehlke,* 345 F.Supp. 440, 444 (W.D. Wis.1972), where the court stated that Section 102(2) does not require that "each problem be documented from every angle to explore its every potential for good or ill."

■ Despite the broad language as to procedural requirements found in Section 102(2), it is well recognized that an EIS must have terminal facilities. We have four volumes of EIS before us. They could easily be expanded into eight, or more. The courts must employ a rule of reason in the examination for adequacy of these statements, lest the litigation have no end.[32] These considerations were well put recently by the Fifth Circuit:

Section 102(2) contains the procedural requirements designed to compel all federal agencies contemplating actions having a significant impact on the environment to consider NEPA's substantive policies and goals as enunciated in Section 101. The effectiveness of Section 102(2) depends upon compliance with procedural duties "to the fullest extent possible," *i. e.,* a compliance, the completeness of which is only limited by the agency's statutory obligations. While no agency may properly adopt a less demanding standard for their effort, judicial review is based

**31.** 382 F.Supp. at 622.

**32.** *Cf.* Judge Oliver in *Environmental Defense Fund, Inc. v. Froehlke,* 368 F.Supp. 231 (W.D. Mo.1973), *aff'd sub nom. Environmental Defense Fund, Inc. v. Callaway,* 497 F.2d 1340 (8th Cir. 1974).

on a pragmatic standard. In determining whether an agency has complied with Section 102(2), we are governed by the *rule of reason, i. e.,* we must recognize "on the one hand that the Act mandates that no agency limit its environmental activity by the use of an artificial framework and on the other that the act does not intend to impose an impossible standard on the agency." The court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors. (Emphasis in original.) (Footnotes omitted.)

*Sierra Club v. Morton,* 510 F.2d 813, 818–819 (5th Cir. 1975).

To the same effect was Judge Matthes' succinct statement respecting the duties of the reviewing court:

Where NEPA is involved, the reviewing court must first determine if the agency reached its decision after a full, good faith [33] consideration and balancing of environmental factors.

*Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army,* 470 F.2d 289, 300 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

■ In the courts the burden is upon the plaintiffs to establish by a preponderance of the evidence that the EIS was inadequate and that the decision to proceed was arbitrary and capricious.[34] It was the holding in the trial court that this burden was not met. In our court it is the plaintiffs' burden to establish that the lower court's findings were clearly erroneous.

Under existing jurisprudence, plaintiffs were required to establish by a preponderance of the evidence, rather than by a prima facie showing of deficiencies, that the EIS for MAFLA was inadequate. The additional attack on the Secretary of Interior's decision to proceed with the leasing must be founded on proof that it was arbitrary and capricious. Since the basic legal premises on which the district judge based his determination that the federal agency actions passed muster were correct, plaintiffs must shoulder a more imposing burden in this Court. Having failed to convince the trial court that the EIS was inadequate, the plaintiffs must now demonstrate that the lower court's findings accepting the EIS as

**33.** The procedure followed and steps taken by the defendants in this matter are clearly indicative of good faith.

The original EIS for Meramec Park Lake was filed with the Council on Environmental Quality (CEQ) on February 23, 1971. That statement was the product of comprehensive coordination between federal, state, and local agencies. In addition, numerous public hearings and meetings were held before this statement was filed, at which the environmental effects of Meramec Park Lake were discussed. (The dates and subjects of those meetings are found in the revised EIS at EIGHT–1–9.) The original EIS was then circulated among interested local, state, and federal agencies for comments. The Public Opinion Survey Unit, Business and Public Administrative Research Center, University of Missouri, Columbia also conducted a survey of public attitudes on the Meramec Park Lake and Union Lake in July and August, 1972 in Franklin, Washington, and Crawford Counties, the counties which would contain those lakes. The results of the agencies' comments and public attitudes were utilized in a draft revised and supplemented EIS filed with the CEQ in June 1973. That statement was sent to appropriate government agencies and private organizations in April 1973 for review purposes. We note that the Ozark Chapter of Sierra Club was invited to comment on this revised and supplemented EIS but failed to respond. The final EIS filed with the CEQ on September 27, 1973 contains detailed responses to the comments received. Where appropriate, the final EIS was changed to accommodate those comments. (Footnote ours.)

**34.** *Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir. 1975). *Sierra Club v. Callaway,* 499 F.2d 982, 992 (5th Cir. 1974); *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army,* 492 F.2d 1123, 1131 (5th Cir. 1974).

[Plaintiff] also attacks generally the sufficiency and completeness of the statement. However, although the statement, like most of its fellows, can be improved by hindsight and sophisticated editing, we believe that the statement satisfied the intent of the statute. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir. 1973). (Citation omitted.)

adequate and the decision to proceed as permissible were clearly erroneous. (Footnote omitted.)

*Sierra Club v. Morton, supra* at 818.

*See also* our holding in *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, supra* at 300:

The standard of review to be applied here and in other similar cases is set forth in *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. [402] at 416, 91 S.Ct. [814] at 824 [28 L.Ed.2d 136]. The reviewing court must first determine whether the agency acted within the scope of its authority, and next whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making the latter determination, the court must decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision itself represented a clear error in judgment.

Where NEPA is involved, the reviewing court must first determine if the agency reached its decision after a full, good faith consideration and balancing of environmental factors. The court must then determine, according to the standards set forth in §§ 101(b) and 102(1) of the Act, whether "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." *Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, supra,* [146 U.S.App.D.C. 33] 449 F.2d [1109] at 1115.

"Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824.

■ It is manifest that the treatment of the issues presented could have been more voluminous. But it is equally clear that the discussion, as we have noted above, need not be exhaustive but, rather, must provide sufficient information that a reasonable choice of alternatives may be made.

■ So tested, and after a careful study of the record, we find no clear error in the court's findings.

The plaintiffs charge, also, violations of the Endangered Species Act of 1973, 16 U.S.C. § 1531, *et. seq.,* with respect to the Indiana bat. This Act is a successor to two previous acts [35] and results from a Congressional finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that others are "threatened with extinction." 16 U.S.C. § 1531(1) and (2). The Act prescribes various safeguards directed towards the preservation of endangered and threatened species.

The Indiana bat was originally listed as an endangered species pursuant to the 1966 Act. It is also found so listed in the most recent listing of such species by the Secretary of the Interior.[36] It is the claim of the plaintiffs that the construction of the Meramec Park reservoir jeopardizes the continued existence of the species and modifies or destroys its habitat in violation of Section 7 of the Act.[37] Alleged, also, is a "taking" of

---

**35.** *See* background discussed in 1973 *U.S.Code Cong. and Adm.News,* at 2989.

**36.** 50 C.F.R. § 17.11 (Oct. 28, 1975).

**37.** 16 U.S.C. *§ 1536. Interagency cooperation*

The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of

this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical.

the bat on the ground that the erection of the dam is a violation of Section 9 [38] of the Act in that its construction is a "clear attempt to harass or harm" the bat by flooding its caves.

■ These charges with respect to endangered species were, as we have noted, introduced by amendment on September 20, 1974, ten days prior to the trial setting of September 30, 1974. At this time the court vacated the trial setting and re-set the trial for November 25, 1974. Defendant's motion to dismiss the Endangered Species Act allegations for failure to plead the requisite notice requirements of the Endangered Species Act, 16 U.S.C. § 1540(g)(2)(A)(i), relying on *City of Highland Park, Ill. v. Train,* 519 F.2d 681 (7th Cir. 1975) *as amended, petition for cert. filed,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337, 44 U.S.L.W. 3322 (1975), involving similar stat-

The Secretary of the Interior, together with the Secretary of Commerce, has published criteria for determining what constitutes a critical habitat. They provide that a federal action would not comply with § 7:

[I]f such action might be expected to result in a reduction in the number or distribution of that species of sufficient magnitude to place the species in further jeopardy, or restrict the potential and reasonable expansion or recovery of that species. . . .

It is emphasized further that certain actions may not be detrimental to 'critical habitat.' There may be many kinds of actions which can be carried out within the 'critical habitat' of a species that would not be expected to result in such reduction in numbers or distribution or otherwise adversely affect such species.

40 Fed.Reg. 17764–17765 (April 22, 1975).

The Fish and Wildlife Service published a notice at 40 Fed.Reg. 21499–21501 (May 16, 1975) of its intention to determine "critical habitat" for 108 endangered species, and that it was particularly interested in receiving data quickly on ten species, including the Indiana bat. On December 16, 1975, the Service issued a proposed rule determining critical habitat for six endangered species. That proposed rule designated six caves in Missouri—Cave 021, Crawford County; Cave 009, Franklin County; Cave 017, Franklin County; Pilot Knob Mine, Iron County; Cave 029, Washington County; and Bat Cave, Shannon County—as critical habitat for the Indiana bat. Three of these six caves are in or near the Meramec Park Lake Project area. Two of these caves—009 and 017 in Franklin County, are located 2–2½ miles downstream from the dam site in Meramec State Park, and will not be inundated by the reservoir. The third cave, 021 in Crawford County, is located 6½ miles from the dam site. It is exactly at flood pool level so that it would only be inundated if the reservoir reached flood pool level, which was called "a remote possibility" or statistically in "a period of once in exceeding ten thousand years." Thus, even if these caves were presently designated "critical habitat," we could not say that trial court determination, namely that § 7 is not being violated, is clearly erroneous. Moreover, designation of these caves as critical habitat is still a pro-

posed rule not in effect. (The earliest date on which the rule could have gone into effect was 60 days after notice of the proposed regulation. *See* 16 U.S.C. § 1533(f)(2)(A)(i). No final rule has yet been published.)

It is significant that the Secretary of the Interior has the power under the act to designate a critical habitat for an endangered species immediately upon publication of the regulation in the Federal Register without the 60-day period necessary for normal rule making. 16 U.S.C. § 1533(f)(2)(B). Such regulation remains in effect for 120 days unless normal rule making procedures are complied with. 16 U.S.C. § 1533(f)(2)(B)(ii). The Secretary chose to exercise his power in the case of the Mississippi sandhill crane whose habitat, he felt, was threatened by construction of a segment of Interstate Highway I–10 between Mississippi State Highway 57 and the Pascagoula River. *See* 40 Fed.Reg. 27501–27502 (June 30, 1975). No such power has been invoked with regard to the Indiana bat and the Meramec Lake Park Project. As a result, its critical habitat remains still proposed.

**38.** 16 U.S.C. *§ 1538. Prohibited acts—Generally*

(a)(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

*See also* § 1532(8) & (14):

(8) The term "person" means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government.

(14) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

utory requirements, was denied, the court ruling that:

> [C]onsidering the fact that there are only five or six experts in the study of Myotine Bats in the world and that the habits, biology and other characteristics of the bats were fully developed at the trial, this Court feels that a dismissal of plaintiffs' claim for failure to comply with the time limit stated in the statute would work an injustice to the adjudication of plaintiffs' claim. To allow defendants to further prepare for trial, in the opinion of this Court, would produce no added evidence which would help this Court in its decision.

392 F.Supp. at 143.

This is a case of first impression. Because of the unique evidentiary situation we sustain the trial court's ruling, but we would not be cited as authority for future disregard of the notice requirement.

In more detail, and we here supplement our previous references to the Indiana bat: it is a small, pastel brown bat found primarily in Missouri, Kentucky and Tennessee, the entire population being stated to number approximately 700,000. Of this number approximately 250,000 are found in Missouri, some 30,000 in the Meramec Basin and of this number, ten to fifteen thousand will be affected by the waters of the reservoir. The bats inhabitating the area are found primarily in caves in and around the area. Caves which will be flooded as a result of the creation of the Meramec reservoir will, of course, no longer furnish shelter for the bat and much of the testimony at the trial related to such caves, their locations and their populations. The normal pool level of the reservoir will be approximately 675 feet above sea level. When this level is reached four caves will be flooded, Cave 022, containing (at the time of the survey) one hundred bats, Cave 015, containing six bats, Cave 013, 100 bats and Cave 020, one bat. In addition, other bats were found to be present in two additional caves below the normal pool level, but the investigation was unable to identify the species. A large number of bats was found in Cave 021 but they are threatened only at "flood pool" level, 709 feet, a level which would be reached, statistically, in "a period of once in exceeding ten thousand years." Bats were also located downstream from the proposed reservoir but these would be unaffected by the pool.

These figures do not go undisputed. As to the normal pool level caves listed above, it is argued that the numbers revealed were not representative, since "the investigations were conducted before any significant hibernation had begun." In addition it was pointed out from the EIS that Mud Cave # 1 and Bat Cave, in the flood pool, hibernating areas for about 5000 bats, "will be inundated periodically and could become a trap for hibernating bats." An expert witness for the plaintiffs, Professor Myers, testified that the project would jeopardize the continued existence of the bat because of the loss of part of its habitat. In his testimony he also pointed out the the bat was vulnerable to human intrusion into its caves, that all of those in the basin area are now open to the public and that "uncontrolled and unregulated recreation in the Meramec Basin" would also be detrimental to the habitat.

The plaintiffs urge a violation of Section 7, *supra,* requiring that all federal agencies act "in consultation with and with the assistance" of the Secretary of the Interior on the ground that defendants have ignored warnings from Interior as to the adverse effect upon the bats of the project and "a request by the Department of the Interior to declare a moratorium on construction." This, plaintiffs argue "cannot be considered a fulfillment of the requirement of acting 'in consultation with and with the assistance' of the Secretary of the Interior."

■ Plaintiffs misread the requirements of the Act. Consultation under Section 7 does not require acquiescence. Should a difference of opinion arise as to a given project, the responsibility for decision after consultation is not vested in the Secretary but in the agency involved. *National Wildlife Federation v. Coleman,* 529 F.2d 359

(5th Cir., filed March 25, 1976). It is to take "such action necessary to insure that actions authorized, funded, or carried out do not jeopardize the continued existence of such endangered species * * * ." [39]

The allegation as to violation of Section 9, as we have noted, rests upon the asserted ground that the erection of the dam is a "clear attempt to harass or harm" the Indiana bat. We are cited to no portion of the record so stating nor do we believe that from a fair reading thereof any such attempt may be found. The purposes of the dam's construction have heretofore been discussed in some detail and need not be elaborated upon at this point. An attempt to harass may not reasonably be found therein. This Act, as any other, must have a reasonable construction.

This is not to say that the agency's decision is beyond judicial review, but in reviewing on its merits the substantive agency decision before us our review is narrow and limited in scope. The same considerations as to scope of review applied by us with respect to NEPA, as held in *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, supra,* are substantially applicable here:

Given an agency obligation to carry out the substantive requirements of the Act, we believe that courts have an obligation to review substantive agency decisions on the merits. Whether we look to common law or the Administrative Procedure Act, absent "legislative guidance as to reviewability, an administrative determination affecting legal rights is reviewable unless some special reason appears for not reviewing." K. Davis, 4 Administrative Law Treatise 18, 25 (1958). Here, important legal rights are affected. NEPA is silent as to judicial review, and no special reasons appear for not reviewing the decision of the agency. To the contrary, the prospect of substantive review should

---

**39.** 16 U.S.C. § 1536. *See also* from the legislative history of the Act, 119 Cong.Rec. 25688–89 (1973) discussion between Senator Tunney, the floor manager of the bill in the Senate and Senator Cook.

Mr. COOK. The only point I am making is that they would have to have consultation with the respective agency. The point I have in mind is that we have the Pioneer Weapons Hunting Area in the State of Kentucky. It is the only one of its kind in the United States. There is no other. It is a tremendous nesting area for wild turkeys.

I might suggest that the Corps of Engineers decided that it would build a road right through the middle of this area. We have tried our best to have them change the route of the road. They had alternate routes, but they decided, despite their alternative routes, that this is where they would build the road.

This language means that they have to consult with the respective agencies under this bill, and they have to consult with the respective State agencies in order to work out this problem. That is exactly what it means. And I would be less than candid if I did not explain that to the Senator.

Mr. TUNNEY. Mr. President, as I understand it, after the consultation process took place, the Bureau of Public Roads, or the Corps of Engineers, would not be prohibited from building such a road if they deemed it necessary to do so.

Mr. COOK. The point is that they would then be doing it after consultation with the respective agencies, rather than making that decision on their own.

Mr. TUNNEY. But they would have the final decision after consultation.

Mr. COOK. The Senator has put me in a rather bad light. Under the terms of this it would have to be under an agreement worked out with the respective agencies.

Mr. TUNNEY. Mr. President, as I understand the legislation, just reading the language:

All other departments, agencies, and instrumentalities of the Federal Government shall, in consultation and with the assistance of the Secretary—

(b) take such action as is necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of any endangered or threatened species, or result in the destruction or modification of any habitat of such species which is determined by the Secretary, after consultation to the extent appropriate and necessary with affected States, to be a critical habitat of such species.

*So, as I read the language, there has to be consultation. However, the Bureau of Public Roads or any other agency would have the final decision as to whether such a road should be built. That is my interpretation of the legislation at any rate.* (Emphasis added.)

improve the quality of agency decisions and should make it more likely that the broad purposes of NEPA will be realized.

\*   \*   \*   \*   \*   \*

The standard of review to be applied here and in other similar cases is set forth in *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824. The reviewing court must first determine whether the agency acted within the scope of its authority, and next whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making the latter determination, the court must decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision itself represented a clear error in judgment. (Footnote omitted.)

470 F.2d at 298–300. *See also National Wildlife Federation v. Coleman, supra.*

■ The differences between the parties may be summarized in their ultimate contentions. The Department of the Interior has urged a moratorium on the entire project, pending further study of the bat. The Corps of Engineers, on the other hand, contends that "the Project would probably have no more than an infinitestimal effect upon the Indiana bat population in the Meramec basin" and that the Sierra Club had failed to meet its "burden of showing that the action of the Corps had jeopardized or would jeopardize the continued existence of the Indiana bat."

The trial court took the proof submitted, including the testimony of recognized experts in the field, held that the defendants had not violated either § 7 or § 9 of the Endangered Species Act of 1973, and further that the evidence failed to show that any of defendants' "present activities in constructing the Meramec Park Reservoir are adversely affecting Indiana bats in the project area." We have reviewed with care the evidence submitted and we find no clear error in the determinations made.

■ Finally plaintiffs urge that in deciding to proceed with the project, despite objections made as to the feasibility of flood plain acquisition, the effect of the dam on the Indiana bat, and the impact of the dam on the entire Meramec Basin, the defendants were arbitrary, capricious, and acting in abuse of their discretion. We are not persuaded of error in the trial court's rejection of the arguments urged. It is clear that the decisions reached by the Corps, in the light of conflicting considerations involved, were difficult and onerous, but they were far from capricious. There is manifested, on the record, a balancing, on the one hand, of the benefits expected to be derived from the project by way of flood control, water supply and abatement of pollution, and recreation, among other considerations, against, on the other hand, the importance of an unspoiled environment. Nor are we unmindful that the project was authorized by the Congress well prior to the passage of NEPA,[40] and that portions of the project involving large sums of money have now been completed. While it is clear that all would not have come to the same conclusions in the premises, these were the agency's decisions to make, not ours. We find nothing arbitrary or capricious, or an abuse of discretion therein.

Affirmed.

---

**40.** There is no inference here that NEPA is not applicable to projects ongoing at the time of the enactment.