UNITED FAMILY FARMERS, INC., a
South Dakota Corporation, et
al., Plaintiffs,

v.

Thomas KLEPPE, Individually and as Secretary of the Department of the Interior of the United States, et al., Defendants.

No. CIV 74–3016.

United States District Court,
D. South Dakota, C. D.

Aug. 18, 1976.

Martin Weeks, Bogue, Weeks & Rusch, Vermillion, S. D., and John Davidson, School of Law, University of South Dakota, Vermillion, S. D., for plaintiffs.

William F. Clayton, U. S. Dist. Atty., for the District of South Dakota, Sioux Falls, S. D., Robert D. Hiaring, Asst. U. S. Atty., Sioux Falls, S. D., Andrew F. Walch, Dept. of Justice, Washington, D. C., and A. E. Bielefeld, Field Sol., Dept. of Interior, Billings, Mont., for federal defendants.

D. J. McClure, Redfield, S. D., for intervenor Spink Irrigation District.

Thomas P. Tonner, Aberdeen, S. D., for intervenor West Brown Irrigation District.

Raymond A. Gallagher, Redfield, S. D., for intervenor Oahe Conservancy Sub-District.

Jerald McNeary, Aberdeen, S. D., for Friends of Oahe.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This is an action for declaratory and injunctive relief. Plaintiffs seek certain declarations that the defendants have failed to comply with statutory and treaty requirements, mandamus compelling such compliance, and injunction pending such compliance. Plaintiffs' amended complaint focuses upon the acts of the defendants in conjunction with the Oahe Diversion Unit (hereinafter Unit) of the Missouri River Basin Project. The Unit is a massive irrigation project contemplated for eastern South Dakota. It was originally authorized by Congress in the Flood Control Act of 1944, ch. 665, 58 Stat. 887, as part of the plan for development of the Missouri River set out in S.Doc. No. 191 and H.R.Doc. No. 475, 78th Cong., 2d Sess. (1944). The plan was revised and coordinated by S.Doc. No. 247, 78th Cong., 2d Sess. (1944).

The Unit originally was authorized as a multi-purpose project with a primary benefit being the irrigation of approximately 495,000 acres. Since 1944 the Bureau of Reclamation of the Department of Interior (hereinafter Bureau) has conducted numerous surveys and engaged in extensive planning for the ultimate development of the Unit. No actual construction, however, had been commenced prior to August 14, 1964. On that date Congress enacted Public Law 88–442, 78 Stat. 446, which prohibited the expenditure of funds to initiate construction of any unit of the Missouri River Basin Project unless specifically re-authorized by Congress.

Subsequently, Congress did authorize what is commonly referred to as the Initial

Stage of the Oahe Unit. Act of August 3, 1968, Pub.L. No. 90–453, 82 Stat. 624. The plan for the Initial Stage was set out in H.R.Doc. No. 163, 90th Cong., 1st Sess. (1967).

> The plan for initial stage of development provides for diversion of water from the existing Oahe Reservoir on the Missouri River for irrigation of 190,000 acres of land, for municipal and industrial use in 17 towns and cities in and near the unit, for fish and wildlife developments at 18 locations, and for recreation uses. There would also be flood control benefits.

Id. at 3. The proposed 190,000 acres are located wholly within Spink and Brown counties in South Dakota. The principal supply works proposed for delivery of water to these counties include the Oahe pumping plant, a system of main canals, three regulating reservoirs, a diversion dam on the James River and a pumping plant at the diversion dam site. The balance of the works would consist of a system of distribution laterals, pumping plants for both delivery and drainage of water, and a drainage system. The ultimate stage of the Unit would increase the irrigated acreage to 495,000 total acres, water for municipal and industrial use in 23 towns and cities, and fish and wildlife developments at 29 locations.

Construction has begun, and in one instance been completed, on various components of the Initial Stage. The Diversion Dam on the James River has been completed. Construction is currently underway on the Oahe Pumping Plant. Attorneys for the defendants have advised the Court that construction on a segment of one of the main supply canals is imminent. Land acquisition by purchase and condemnation has been commenced by the Bureau. Although controversy has continued to surround the proposed Unit, the Bureau has proceeded with development since Congress has con-tinued to annually appropriate money for the Unit.

Plaintiffs now seek to halt further construction by this action. The amended complaint contained nine separate causes of action each arising under various laws and treaties of the United States and laws of the State of South Dakota. During the pendency of this action and before trial the Court dismissed five separate causes of action.[1] Summary judgment for the defendants was granted as to the amended ninth cause of action. The sixth cause of action was dismissed at the close of the plaintiffs' case in chief. Only the first and eighth causes of action remain viable.[2]

Plaintiff United Family Farmers, Inc. (hereinafter Family Farmers) is a nonprofit corporation organized and existing under the laws of the State of South Dakota. It has a current membership of approximately 900 members the majority of whom either reside or own land in Spink and Brown counties. Plaintiffs Schmitgen and Bayne live and farm near the proposed Blunt Reservoir. Plaintiff Foth leases and farms land near the proposed Blunt Reservoir. Plaintiffs Riese and Braun own land near the James River. The plan of development for the Unit currently authorized includes channelization of the James River since it will act as the drain for the entire Unit. Plaintiffs Oliver, Fischbach, Hammer and O'Daniel each own land within the two irrigation districts[3] authorized to receive water once the Unit is operational. Plaintiff West Rondell Township is a civil township organized under South Dakota law and located in and near the Unit.

Defendant Kleppe is the Secretary of the Interior, United States Department of the Interior. Defendant Stamm is the Commissioner of the Bureau of Reclamation, United States Department of the Interior. Defendant McPhail is Regional Director of Region 6, United States Bureau of Recla-

---

1. Counts II, III, IV, V and VII.

2. Count I arises under The National Environmental Policy Act of 1969, 42 U.S.C. Sections 4321 et seq. Count VIII arises under the Uni-form Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. Sections 4601 et seq.

3. Spink and West Brown Irrigation Districts.

mation. The Unit is located in Region 6. Defendant Funkhouser is employed by the Bureau of Reclamation as project manager for the Unit. Defendant Gordon H. Ball, Inc., is a corporation organized under the laws of Nevada and is presently the prime contractor for construction of the Oahe Pumping Plant. Defendants Spink and West Brown Irrigation Districts are political subdivisions of the State of South Dakota and were permitted to intervene on July 31, 1975. Defendant Oahe Conservancy Sub-district is a political subdivision of the State of South Dakota and was permitted to intervene on October 23, 1975. Friends of Oahe, Inc., a nonprofit corporation organized under the laws of the State of South Dakota, was permitted to appear as Amicus Curiae.

Jurisdiction is alleged under the Administrative Procedure Act, 5 U.S.C. Sections 701–706; 28 U.S.C. Section 1331(a) (Federal Question); 28 U.S.C. Section 1361 (Mandamus); and, 28 U.S.C. Sections 2201 and 2202 (Declaratory Judgment). Defendants have not challenged the jurisdiction of this Court over the subject matter. Defendants have challenged the standing of the plaintiffs to maintain this action.

## STANDING

■ A party has standing to obtain judicial review of federal agency action under Section 10 of the Administrative Procedure Act when he establishes that the challenged action has caused him "injury in fact" and the injury was to an interest "arguably within the zone of interests to be protected or regulated" by the statutes that the agen-

cies allegedly violated. *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir. 1976); *Coalition for Environment v. Volpe,* 504 F.2d 156, 165 (8th Cir. 1974). The test of "injury in fact" requires that the party seeking review be himself among the injured. *United States v. SCRAP,* supra 412 U.S. at 688–89, 93 S.Ct. 2405; *Sierra Club v. Morton,* supra, 405 U.S. at 733, 92 S.Ct. 1361; *Coalition for Environment v. Volpe,* supra at 166.

■ Family Farmers has alleged that its members have sustained "injury in fact" as a result of agency action. One of the purposes of Family Farmers is

by all lawful means to oppose and defend against the practices and policies of those local, state and federal agencies and those individuals and other associations which appear likely to threaten the continued health and vitality of the family farm unit.[4]

An organization has standing to represent in a proceeding for judicial review its members injured by agency action. *Sierra Club v. Morton,* supra, 405 U.S. at 739, 92 S.Ct. 1361. Furthermore, an organization whose members are affected by the challenged agency action may represent the public's interest in the environment as well as its membership. *Churchill Truck Lines, Inc. v. United States,* supra at 416. George Piper, President of Family Farmers, testified that a majority of the membership of the organi-

4. The full text of the purposes of United Family Farmers set out in the Articles of Incorporation is as follows:

> To encourage careful and prudent soil, water, air and other resourceful conservation; to cooperate with appropriate local, state and federal agencies and with individuals and other associations engaged in activities and purposes likely to preserve and improve that social structure and climate in which the family size farm will flourish as an economic and social unit; by all lawful means to oppose and defend against the practices and policies of those local, state and federal agencies and those individuals and other associa-

> tions which appear likely to threaten the continued health and vitality of the family farm unit; to collect and disseminate accurate information relating to conditions, plans and programs likely to affect the future of agricultural and of our natural environment and resources; to assist and promote fact finding and research programs and activities likely to further the causes of this association; to advance and defend the rights of its members and of individuals similarly situated; to acquire, hold and dispose of real and personal property, to sue and be sued, and to do all things and acts necessary and incidental to these general powers and purposes.

zation owned or leased land within the proposed Unit area. Some of the members own land within the Spink and West Brown Irrigation Districts and are eligible to receive project water once delivery is commenced. Other members own lands adjacent to Unit lands and will be adversely affected by the delivery and drainage systems particularly if the drainage system does not function adequately. Other members of the organization will have lands and homes taken for project purposes and will be displaced persons within the meaning of the Uniform Relocation Assistance and Land Acquisition Policies Act, 42 U.S.C. Sections 4601 et seq.

The individual plaintiffs will also be adversely affected by various characteristics of the proposed project. Schmitgen and Bayne will be displaced by the proposed Blunt Reservoir. Foth leases land in the proposed Blunt Reservoir tract and will lose the ability to farm the land if the project is completed. Riese and Braun own and farm lands adjacent to the James River and bounded partially by lands which will receive water from the proposed project. Their property will be directly affected by any resultant flooding of the James River caused by irrigation return flows. Their lands would be directly affected if defendants should channelize the James River pursuant to the currently authorized plan. Oliver, Fischbach, Hammer and O'Daniel all own lands located within one of the two irrigation districts authorized to receive project water. Their lands would be directly affected by water logging, salting and flooding within the project area. See *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1973).

Defendants in their post-trial memorandum addressed only the standing of West Rondell Township as a proper plaintiff. They agree that no evidence was submitted that township roads and logistical patterns would be affected by the project. The Final Environmental Statement (hereinafter FES) for the Unit contains the following statements:

\*　　\*　　\*　　\*　　\*　　\*

A network of county and township roads along section lines covers much of the area (II–24).

\*　　\*　　\*　　\*　　\*　　\*

Canals and laterals will sever some farms, and some roads will be rerouted. *Until planning is more complete, the extent of this impact cannot be determined.* (III–4) (Emphasis added).

The potential adverse effects to West Rondell Township are manifest. Furthermore, it is clear that there will be an increase in traffic on township roads causing additional wear and tear on the road system. (FES, III–46).

█ The Court finds that plaintiffs have standing to maintain this action. I now turn to an analysis of plaintiffs' first cause of action.

### NEPA

The National Environmental Policy Act, 42 U.S.C. Sections 4321 et seq., became effective on January 1, 1970. The Act is a mandate to federal agencies that they must consider and give effect to the policies and goals of the Act. *Minnesota Public Interest Group v. Butz,* 498 F.2d 1314, 1320 (8th Cir. 1974); *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289, 298 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). The achievement of these goals is to be facilitated by the requirement that a detailed environmental statement be prepared by an agency whenever it proposes legislation and other major Federal actions significantly affecting the quality of the environment.

█ Plaintiffs have challenged the actions of the defendants for their alleged failure to comply with the substantive provisions of the Act. The FES filed for the Initial Stage of the Unit is challenged as inadequate. The decision of the defendants to propose the project and proceed with construction is challenged as being outside the scope of authority of these defendants and that the decision to proceed was arbi-

trary, capricious, an abuse of discretion, and not in accordance with the law. The standard for judicial review of an environmental impact statement has been stated as follows:

> The court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decision-maker to fully consider and balance the environmental factors.

*Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (8th Cir. 1976) (quoting from *Sierra Club v. Morton,* 510 F.2d 813, 818–819 (5th Cir. 1975)). The shorthand description customarily given to the review criterion of an FES is whether or not the statement is adequate. Adequacy of the statement depends on whether the proposing agency has fully and objectively presented the environmental impacts of the proposed project. District Courts are admonished to employ a "rule of reason" in considering the adequacy of an FES. See *Sierra Club v. Froehlke,* 534 F.2d 1289, 1299 (8th Cir. 1976).

> A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an [FES].

*Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974).

An analysis of the FES is an integral step in determining whether or not the decision of the agency to proceed with the project was arbitrary and capricious. Courts are charged with the responsibility of insuring that the substantive decision of the agency to proceed is made only after the agency has complied with the mandate of NEPA and that the result of that process, the FES, is an adequate predicate for the actions of the agency. See *Arkansas Community Organization For Reform Now v. Brinegar,* 398 F.Supp. 685, 695 (E.D.Ark. 1975). The agency process may not be disturbed for non-compliance with NEPA if it is shown that the agency action was based on a good faith, objective evaluation of the environmental impacts. See *Katsev v. Coleman,* 530 F.2d 176, 179–180 n. 4 (8th Cir. 1976).

The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." (citation omitted).

*Kleppe v. Sierra Club,* —— U.S. ——, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 801 (1976).

These are the standards the Court must follow. The burden is upon the plaintiffs to establish by a preponderance of the evidence that the defendants' actions do not comply with these standards. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (8th Cir. 1976); *Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir. 1975). For the reasons that follow, the Court finds that Plaintiffs have not met this burden with respect to the alleged deficiencies.

## SEGMENTATION

Plaintiffs maintain that the FES does not encompass the entire proposed project. The impacts which have not been discussed according to Plaintiffs include the segmentation of the ultimate stage from the initial stage, the impacts to water volume and quality of the James River, the impacts from developments for municipal and industrial water, and the impacts from canal-side irrigation. I discuss these issues seriatim.

Congress has authorized only what has been continuously identified as the Initial Stage of the Oahe Unit. Once constructed, the Initial Stage is scheduled to deliver sufficient water to irrigate 190,000 acres of land within the project area, provide water for 17 towns and cities, and fish and wildlife developments at 18 locations. Should Congress decline to ever authorize part or all of the ultimate stage, the Initial Stage would remain independently functional. The independent viability of the Initial Stage is an essential consideration in determining whether the FES addresses the impacts of the *proposed action.*

Where it is found that the project before the court is an essentially independent one, an EIS for that project alone has been found sufficient compliance with the

act. In such case there is no irretrievable commitment of resources beyond what is actually expended in an individual project. (Citation omitted).

*Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1976); see *Sierra Club v. Callaway,* 499 F.2d 982, 990 (5th Cir. 1974).

■ The Initial Stage meets this criterion. There is no doubt that if the Initial Stage is sound from an engineering standpoint, it will function independently even if the ultimate stage is never authorized and constructed. Furthermore, it is only the Initial Stage which has been authorized by Congress and this is a relevant consideration when assessing a claim of improper segmentation. *Sierra Club v. Callaway,* 499 F.2d 982, 987 (5th Cir. 1974). The Supreme Court has recently emphasized that an impact statement is required only for a proposed action. Mere contemplation of action does not trigger such a requirement. *Kleppe v. Sierra Club,* —— U.S. ——, 96 S.Ct. 2718, 49 L.Ed.2d 801 (1976).

> Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.
>
>     *     *     *     *     *     *
>
> Thus, an agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals.

—— U.S., supra at —— n. 20 and —— n. 26, 96 S.Ct., supra at 2730 n. 20 and 2733 n. 26. At this point the future of the ultimate stage is conjectural at best. The activities of Plaintiffs may well have contributed to insuring that the decision to construct the ultimate stage will never be made. The consequences of operation of the Initial Stage might dictate a reassessment with reference to future construction of the ultimate stage. These observations are admittedly conjectural as is the ultimate stage and the Court finds that segmentation of the ultimate and initial stages was proper.

■ Plaintiffs also focus on the decision of Defendants to postpone a complete discussion of the environmental impacts on the James River until further study has been completed. Plaintiffs are primarily concerned with the ability of the James River to handle the volume of water which will be introduced into the James River Basin by the project. The current plan authorizes the channelization of the James River where it traverses the project area. This has caused considerable comment and opposition on the part of farmers and other interested persons. Defendants have admitted that continuing studies are being made on the question of the optimum use of the James River for drainage purposes. An on-going study does not render an FES inadequate as long as the need for such continuing study is stated in the FES. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1296 (8th Cir. 1976); see *Environmental Defense Fund, Inc. v. Corps of Engineers,* 342 F.Supp. 1211, 1217 (E.D.Ark.1972), aff'd 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). The FES clearly states that a study is being made and that a supplemental environmental statement would be prepared in connection with the study. (FES, VIII–24). This is also the case with reference to municipal and industrial water supply and canal-side irrigation. (FES, III–38; FES, I–40). It is readily apparent that predominant reliance on "future studies" may result in the classic case where the exceptions swallow the rule. The danger is obvious and construction premised on such representations may subsequently be justified by the classic argument that too much money has already been spent to stop the project at a late date. I sincerely hope that the Defendants are aware of the danger. Conversely, continued study may help develop alternatives which are less destructive of the environment and which could be of invaluable assistance once brought to the attention of decision-makers. It is hopeful

that this premise will be vindicated in the future. Suffice it to say that at this point the need for further study has been brought to the attention of the decision-makers and future decisions will be made with this information fully set out in the FES. The Court finds that the discussion of James River flooding, municipal and industrial water supply, and canal-side irrigation has been adequately discussed in the FES. Where such discussion has been limited, the FES clearly discloses that supplemental studies are being made and supplemental environmental statements will be filed.

## VOLUME OF JAMES RIVER FLOWS

The introduction of 440,000 acre-feet into the James River Basin from the Missouri River will cause a substantial increase in the volume of water which reaches the James River. Plaintiffs have challenged the adequacy of the discussion contained in the FES concerning this water. The information provided in the FES supports several significant conclusions. The annual increase to the James River from the Unit will be 100,000 acre-feet. (FES, III–7). The bulk of this increase will come during the irrigation season and peak in late summer. (FES, III–7). Major flood damage along the James River comes in the Spring when snow-melt runoff and spring rains cause increased drainage runoff. The plan for the Unit contemplated the diversion of water from the James River to Byron Reservoir during the period when natural flows of the James River are normally at a maximum. The net effect is that the peak irrigation flows will arrive at the River at a time when the natural flow of the River is diminished. The pumping of water from the River to Byron Reservoir during March through October will help reduce the total volume of water during natural peak periods and irrigation peak periods. The FES contains admissions that some flooding will occur along the James River as a result of Unit operations. The exact consequences remain unknown at this time since, as noted above, Defendants are in the process of reconsidering the plan with reference to the James River.

The incidence of additional flooding as well as duration of increased flooding and flood damages will be considered in more detail during continuing studies of alternatives to channel modification and results shown in the supplemental environmental statement. (FES, III–57).

The Court finds that the discussion of James River flooding is adequate and that decision-makers have been placed on notice of the potential risks and the fact that continuing studies on this problem are being performed.

## JAMES RIVER WATER QUALITY

The one point which all parties have been able to agree upon is that water quality of the James River will be diminished by the project return flows. The FES contains a candid admission of this impact.

Return flows from Oahe Unit irrigation will cause some degradation of the chemical quality of the James River and its tributaries. The concentration of total dissolved solids in these streams will be increased as a result of the project, but they will still be suitable for most uses without treatment. (FES, III–12).

Defendants have also disclosed that the adverse impacts will be intensified during the first 20 to 40 years of irrigation. It is during this period that the application of irrigation water will "leach" excess salts from the soil in the project area. It is projected that the "leaching" process will stabilize sometime during the 20 to 40 year period and the operation reaches equilibrium.

It is recognized that during the early years of operation leaching of excess salts from the soil profile will cause an increase in TDS. The leaching process and land development schedule that lead to soil-water equilibrium will last for at least 20 years (and may extend to 40 years), during which time TDS concentrations in excess of 2,200 p. p. m. may be expected in the resulting return flows of some drains for short periods of time. (FES, III–13).

The problems have been set out in sufficient detail to alert decision-makers of the potential and expected adverse impacts to James River water quality.

Additionally, the Defendants in conjunction with other federal agencies including the Environmental Protection Agency are in the process of reviewing water quality impacts through a water quality model study. The existence of on-going studies has been disclosed to decision-makers in the FES. (FES, III–13). The Court will not make a determination that the FES is inadequate when it is apparent from the record that the Defendants are reviewing the acknowledged problems with good faith objectivity. See *Katsev v. Coleman,* 530 F.2d 176, 179–180 (8th Cir. 1976); *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289, 296 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749 37 L.Ed.2d 160 (1973). The isolation and identification of a problem is the threshold step in finding a solution. The FES has identified the problem. The FES has disclosed that studies of the precise impacts are continuing and that additional study may require a reassessment of present plans.

> There is a considerable amount of flexibility in the plan of development which could be implemented even after construction of the project is well underway if the conditions are different than shown by present studies. (FES, VIII–26).

The decision to proceed under these conditions rests with those public officials charged with the responsibility of making hard decisions.

The effect on the James River by the possibility of return flows from the Garrison Project in North Dakota was covered in the evidence produced at the trial as well as considered by the Court when it granted Plaintiffs' motion to reopen the case for reception in evidence as an exhibit, House Report No. 94–1335, 94th Cong., 2d Sess. (1976). The possible effect on the South Dakota portion of the James River is treated on pages 41 to 43 of said report.

In view of the passage of the resolution by the South Dakota legislature strongly objecting to the Garrison return flows into the James River and the tenor of the House Report reviewing the environmental and economic aspects of the Garrison Diversion Unit in North Dakota, this Court is not persuaded that this matter should alter this Court's decision relative to the James River flows and water quality.

## IMPACTS ON SOILS

An essential consideration for any irrigation project is a drainage system. Some method or system is required to remove the excess salts and water away from the irrigation area. If the drainage system fails or is inadequate, the water and salts accumulate in the project area. The net result is the soil becomes saline, water-logged, sterile, and unproductive. It is this consideration upon which Plaintiffs have primarily focused.

The adverse impacts from inadequate drainage are well documented throughout history. Defendants have readily admitted that even Bureau projects have been adversely affected by salinity and water-logging. Plaintiffs have attempted to establish that the proposed drainage system for the Unit will not protect the project area from these adverse impacts. The Bureau is equally confident that the drainage system as envisioned by the Bureau will protect both project and non-project lands.

The resolution of this issue is in essence dependent upon the credibility and technological skill of the Bureau personnel. The FES certainly discloses that a drainage system is an integral element of the Unit. While express language is not detectable in the FES, I believe a natural corollary of the proposed drainage plan outlined in the FES is that serious environmental consequences are inevitable should the drainage system prove inadequate.

The adequacy of the drainage system, however, is not the proper concern of this Court. Plaintiffs have admitted as much.

> We realize that that (sic) testimony on the "soils issue" was quite long and in-

volved. We realize, too, that the issue involves the "adequacy" of an impact statement about impacts on soils and does not go to a contest over the Oahe drainage plan itself.

Brief of Plaintiffs on the Facts of First Cause of Action at 37. I have therefore determined that the FES sufficiently alerts decision-makers of the possible adverse effects upon the soil.

> Land selection and classification, adequate internal drainage of subsoils by natural or artificial means, and the implementation of good agricultural practices after irrigation development will insure that land is not degraded by soil salinization.

> \* \* \* \* \* \*

> Sufficient water must be applied to the land to prevent accumulation of salts. The predicted level of salinity is based on a soil-irrigation water equilibrium with excess salt and water being removed with properly installed artificial drainage. . . . The interrelationship between salinity and drainage requires a rigid standard for subsurface soil drainage evaluation. Bureau of Reclamation standards require that irrigation development meet economic limitations for the installation of artificial drainage and still provide adequate drainage to meet salinity leaching requirements and the control of excess ground water to maintain sustained irrigated agriculture. (FES, III–5).

Plaintiffs have certainly raised substantial questions as to the engineering feasibility of the proposed Unit drainage plan. Disagreement among experts, however, as to the technical plans and engineering feasibility of proposed action will not invalidate a FES. *Cady v. Morton*, 527 F.2d 786, 796 (9th Cir. 1975); *Life of the Land v. Brinegar*, 485 F.2d 460, 473 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The technical data amassed by the Bureau over a 30 year period concerning the soils within the Unit are voluminous. An average of 28 soil holes were drilled per section in the Unit area by the Bureau. This Court, the final decision-makers, as well as the Public are dependent on the skill and competence of responsible agency personnel whose expertise we rely upon to insure that the proposed plan functions as it is projected. If they are wrong, the comments of the District Judge in *Environmental Defense Fund v. Corps of Engineers*, 342 F.Supp. 1211 (E.D.Ark.1972), are appropriate:

> Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, including, ultimately, the President and the Congress itself.

342 F.Supp. at 1217. The FES adequately alerts decision-makers of the environmental hazards to the soil if the drainage scheme proposed by the Bureau proves inadequate. See *Sierra Club v. Froehlke*, 534 F.2d 1289, 1296 (8th Cir. 1976); *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 853 (8th Cir. 1973).

## ALTERNATIVES

The FES reference to project alternatives is set out in chapter VIII. A review of this section must disclose not only a listing of alternatives, but the results of investigation and evaluation of these alternatives. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 350 (8th, Cir. 1972). Chapter VIII of the FES encompasses 35 pages or material, charts and photographs. As is frequently noted, the organization of the material and the detail could have been improved, but this Court is not prepared to state that defendants have not complied with the guidelines set forth in 40 C.F.R. Section 1500.8(a)(4). It is to be expected that equal resources will not be expended in an examination of alternatives as will be expended in studying the proposed action. Agency bias is presumed and decision-makers can be expected to consider this bias in reviewing the alternatives set forth in the FES. See *Katsev v. Coleman*, 530 F.2d 176, 179–180 n. 4 (8th Cir. 1976).

Chapter VIII discusses the alternatives of non-development, irrigation of lands other than those in the Oahe Unit, modifications of the proposed channelization of the James River, elimination of the East Lake Plain area from the Initial Stage, municipal and industrial water, and project operation during the entire year to improve James River water quality. The Court finds this discussion adequate.

## WILDLIFE

The impacts of project development upon wildlife in the Unit area will be substantial. Intensified farming in the project area is expected to have adverse impacts on wildlife. The drainage system will drain some of the wetlands presently found throughout the project area. The Bureau has not sought to hide the impacts in their disclosures made in the FES. The Bureau has attempted to minimize such impacts through 18 wildlife mitigation areas planned for development.

> The total acreage of wildlife habitat on the irrigated lands will be reduced as a result of more intensified farming and some wetland drainage . . .. (FES, III–24).

The proposed channelization of the James River is identified as having adverse impacts on fur-bearing animals and fish in the affected area (FES, III–25). Habitat for migratory waterfowl is specifically identified as being adversely affected by the project. (FES, III–26 through III–29).

Plaintiffs presented the testimony of Dr. Harmon to establish that the discussion of impacts on wildlife in the area was inadequate. Dr. Harmon's testimony pinpointed the conceptual difficulties a reviewing court must contend with in assessing the "adequacy" of an impact statement. On the one hand there are the unequivocal admissions in the FES that there will be adverse impacts on wildlife and a reasonable explanation of where these impacts will occur. On the other hand is the testimony of Dr. Harmon, whose expertise goes unchallenged, to the effect that he has evaluated approximately 100 impact statements and found all

lacking in assessment of wildlife impacts. Dr. Harmon may be correct in his assessment, but such a conclusion may be more dependent on one's bias against all environmental degradation rather than recognition that NEPA was not intended to prohibit those projects resulting in environmental degradation. The purpose of NEPA was to insure that environmental degradation would occur only after such effects were brought into the decision-making process. The FES has served its purpose and fulfilled the goals set forth in NEPA. The decision to continue the project with its adverse consequences cannot be blamed on the inadequacy of the FES.

## SECONDARY IMPACTS

The Plaintiffs contest the adequacy of the discussion concerning secondary impacts. A discussion of secondary impacts is desirable whenever such impacts are significant. 40 C.F.R. Section 1500.8(a)(3)(ii). The discussion of secondary impacts is set forth in the FES at III–2 through 4 and III–32 and 33.

The Court agrees with the Plaintiffs that the discussion of secondary impacts is meager at best. Population growth in the 19 towns and cities which are projected to receive water from the Initial Stage development is estimated to be 85,000 people. There is no discussion or explanation of this projection or of the environmental consequences from such growth.

It is interesting to note, however, that Plaintiffs' expert in this field spent most of the time explaining why projected growth from an irrigation project was not justified. Professor Weinkauf based his testimony on a comparison between the Oahe Unit and the Columbia River Basin Project. His conclusion based on his studies was that irrigation development actually causes a net loss of population. Assuming that population growth stimulates environmental degradation, Plaintiffs' witness demonstrated that there will actually be a net population loss in the Unit area. His testimony rebuts the projected growth figures in the FES and actually supports the conclusion that there

will not be environmental degradation as a result of population growth. The Court will not attempt to reconcile these conflicts. The only reasonable conclusion is to find that the burden was upon the Plaintiffs to show an inadequate discussion of anticipated secondary effects and that they did not meet this burden.

The findings of the Court with reference to the first cause of action (NEPA) are based solely on the standard of review this Court must follow. The questions raised by the Plaintiffs are penetrating and serious. The concerns of John Elsing, Ray Braun, George Piper and others are not based on irrational speculation or blind refusal to accept technological progress. The adverse environmental impacts of the Initial Stage admitted by the Defendants and set forth in the FES are substantial. The consequences if the project is not engineeringly sound are even more profound and would mean the loss of a way of life for those who have toiled in the project area most or all of their lives. This Court, however, may not concern itself with the political considerations of development versus non-development, engineering feasibility versus non-feasibility. The Supreme Court has recently reiterated that courts are not to substitute their judgment for that of the agencies which are charged with the responsibility of making such determinations. *Kleppe v. Sierra Club*, —— U.S. ——, —— n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 801 (1976). The decision to proceed is vested elsewhere than in the Federal Courts.

The technical data amassed by the Bureau is formidable, the product of 30 years of studies and plans to bring the Oahe Unit to fruition. Their materials have been placed in the bibliography section of the FES. Condensed in non-technical terms are part of those studies as well as the Bureau's evaluation of the environmental impacts. Many of the problem areas are still being studied and the on-going process has been fully disclosed to responsible decision-makers. Complete information concerning the environmental impacts of a project is not required before action is taken.

If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated.

*Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973). If the process is at all reversible, Plaintiffs must concentrate their efforts in an attempt to influence the public officials who must make the decisions. It is the finding of this Court that the Plaintiffs have failed to establish by a preponderance of the evidence that the FES is not adequate and that the decision to proceed with the project was arbitrary, capricious, an abuse of discretion or contrary to existing law. Plaintiffs' prayer for relief is denied in all respects.

## RELOCATION ASSISTANCE

■ Plaintiffs' eighth cause of action arises under Sections 205 and 206 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. Sections 4625 and 4626. Section 4625 requires an agency to provide a relocation assistance advisory program whenever agency action includes land acquisition which will displace persons. The program is designed to lessen the impacts upon those persons who are displaced for the benefit of the public as a whole. *Katsev v. Coleman*, 530 F.2d 176, 180–181 n. 7 (8th Cir. 1976).

The Defendants have submitted an exhibit which bears the label "Relocation Program." (Defendants' Exhibit 209). Contained in that exhibit are lists of available housing and general information brochures. The existence of a file folder on relocation assistance does not satisfy the requirements of Section 4625. The success of any program is dependent on the good faith compliance by agency personnel and accessibility to them by persons affected by the proposed action. In short, the Defendants have left themselves ample room for improvement in the development of their relocation program.

However, Plaintiffs have not carried the burden of showing that the Defendants have failed to comply with the statutory

requirements. Plaintiffs' evidence consisted of the testimony of Irvin Bayne, and the depositions of Stanley Foth, Theodore Schmitgen and Arthur Mischke. Mischke was an employee of the Bureau and his deposition, taken in 1974, disclosed that there was no plan in existence to assist those persons who might be displaced by the project. Plaintiffs have admitted by their attorney, however, that the efforts of the Defendants in this area have improved since that time. Bayne, Schmitgen and Foth all are scheduled to be displaced although none had been displaced as of the date of trial. The responsibilities of the appropriate agency need not be discharged at one time with respect to all those who eventually will be displaced by the project. *Arkansas Community Organization For Reform Now v. Brinegar*, 398 F.Supp. 685, 694 (E.D.Ark.1975). It is hoped that the services available under the Act will be made available to these individuals and others at a reasonable time prior to their actual relocation. Discontent with whatever the agency might do is to be expected from people who are forced to leave their homes. A responsible agency will perform in spite of this, however, and comply fully with the requirements of the Act. Of course, the Act does not mandate that a relocatee be guaranteed identical substitute housing. *Katsev*, supra at 180–181, n. 7.

The Court finds that adequate and appropriate plans now exist for ensuring the efficient relocation of people displaced because of project construction. Plaintiffs' prayer for relief is denied in all respects.

The foregoing constitute the Court's findings of fact and conclusions of law. Counsel for Defendants will prepare an appropriate order.